# FUENTES *v.* SHEVIN, ATTORNEY GENERAL OF FLORIDA, ET AL.

No. 70–5039.   Argued November 9, 1971—Decided June 12, 1972*

*Together with No. 70–5138, *Parham et al.* v. *Cortese et al.*, on appeal from the United States District Court for the Eastern District of Pennsylvania.

68

STEWART, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, and MARSHALL, JJ., joined. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and BLACKMUN, J., joined, *post*, p. 97. POWELL and REHNQUIST, JJ., took no part in the consideration or decision of the cases.

C. *Michael Abbott* argued the cause *pro hac vice* for appellant in No. 70–5039. With him on the brief was *Bruce S. Rogow. David A. School* argued the cause

*pro hac vice* for appellants in No. 70–5138. With him on the brief was *Harvey N. Schmidt.*

*Herbert T. Schwartz,* Deputy Attorney General of Florida, argued the cause for appellee Shevin in No. 70–5039. On the brief was *Robert L. Shevin,* Attorney General of Florida, *pro se. George W. Wright, Jr.,* argued the cause for appellee Firestone Tire & Rubber Co. in No. 70–5039. With him on the brief was *Karl B. Block, Jr. Robert F. Maxwell* argued the cause for appellees in No. 70–5138 and was on the brief for appellee Sears, Roebuck & Co. *J. Shane Creamer,* Attorney General, and *Peter W. Brown,* Deputy Attorney General, filed a brief for appellee the Commonwealth of Pennsylvania in No. 70–5138.

Briefs of *amici curiae* urging reversal in No. 70–5039 were filed by *Allan Ashman* for the National Legal Aid and Defender Association and by *Blair C. Shick, Jean Camper Cahn,* and *Barbara B. Gregg* for the National Consumer Law Center of Boston College Law School et al.

*Harry N. Boureau, Ross L. Malone, Robert L. Clare, Jr.,* and *George J. Wade* filed a brief for General Motors Acceptance Corp. et al. as *amici curiae* urging affirmance in No. 70–5039.

MR. JUSTICE STEWART delivered the opinion of the Court.

We here review the decisions of two three-judge federal District Courts that upheld the constitutionality of Florida and Pennsylvania laws authorizing the summary seizure of goods or chattels in a person's possession under a writ of replevin. Both statutes provide for the issuance of writs ordering state agents to seize a person's possessions, simply upon the *ex parte* application of any other person who claims a right to them and posts a

security bond.  Neither statute provides for notice to be given to the possessor of the property, and neither statute gives the possessor an opportunity to challenge the seizure at any kind of prior hearing.  The question is whether these statutory procedures violate the Fourteenth Amendment's guarantee that no State shall deprive any person of property without due process of law.

## I

The appellant in No. 5039, Margarita Fuentes, is a resident of Florida.  She purchased a gas stove and service policy from the Firestone Tire and Rubber Co. (Firestone) under a conditional sales contract calling for monthly payments over a period of time.  A few months later, she purchased a stereophonic phonograph from the same company under the same sort of contract.  The total cost of the stove and stereo was about $500, plus an additional financing charge of over $100.  Under the contracts, Firestone retained title to the merchandise, but Mrs. Fuentes was entitled to possession unless and until she should default on her installment payments.

For more than a year, Mrs. Fuentes made her installment payments.  But then, with only about $200 remaining to be paid, a dispute developed between her and Firestone over the servicing of the stove.  Firestone instituted an action in a small-claims court for repossession of both the stove and the stereo, claiming that Mrs. Fuentes had refused to make her remaining payments.  Simultaneously with the filing of that action and before Mrs. Fuentes had even received a summons to answer its complaint, Firestone obtained a writ of replevin ordering a sheriff to seize the disputed goods at once.

In conformance with Florida procedure,[1] Firestone

---

[1] See *infra,* at 73–75.

had only to fill in the blanks on the appropriate form documents and submit them to the clerk of the small-claims court. The clerk signed and stamped the documents and issued a writ of replevin. Later the same day, a local deputy sheriff and an agent of Firestone went to Mrs. Fuentes' home and seized the stove and stereo.

Shortly thereafter, Mrs. Fuentes instituted the present action in a federal district court, challenging the constitutionality of the Florida prejudgment replevin procedures under the Due Process Clause of the Fourteenth Amendment.[2] She sought declaratory and injunctive relief against continued enforcement of the procedural provisions of the state statutes that authorize prejudgment replevin.[3]

The appellants in No. 5138 filed a very similar action in a federal district court in Pennsylvania, challenging the constitutionality of that State's prejudgment replevin process. Like Mrs. Fuentes, they had had possessions seized under writs of replevin. Three of the appellants had purchased personal property—a bed, a table, and other household goods—under installment sales contracts like the one signed by Mrs. Fuentes; and the sellers of the property had obtained and executed summary writs of replevin, claiming that the appellants had fallen behind in their installment payments.

---

[2] Both Mrs. Fuentes and the appellants in No. 5138 also challenged the prejudgment replevin procedures under the Fourth Amendment, made applicable to the States by the Fourteenth. We do not, however, reach that issue. See n. 32, *infra*.

[3] Neither Mrs. Fuentes nor the appellants in No. 5138 sought an injunction against any pending or future court proceedings as such. Compare *Younger* v. *Harris*, 401 U. S. 37. Rather, they challenged only the summary extra-judicial process of prejudgment seizure of property to which they had already been subjected. They invoked the jurisdiction of the federal district courts under 42 U. S. C. § 1983 and 28 U. S. C. § 1343 (3).

The experience of the fourth appellant, Rosa Washington, had been more bizarre. She had been divorced from a local deputy sheriff and was engaged in a dispute with him over the custody of their son. Her former husband, being familiar with the routine forms used in the replevin process, had obtained a writ that ordered the seizure of the boy's clothes, furniture, and toys.[4]

In both No. 5039 and No. 5138, three-judge District Courts were convened to consider the appellants' challenges to the constitutional validity of the Florida and Pennsylvania statutes. The courts in both cases upheld the constitutionality of the statutes. *Fuentes* v. *Faircloth,* 317 F. Supp. 954 (SD Fla); *Epps* v. *Cortese,* 326 F. Supp. 127 (ED Pa.).[5] We noted probable jurisdiction of both appeals. 401 U. S. 906; 402 U. S. 994.

---

[4] Unlike Mrs. Fuentes in No. 5039, none of the appellants in No. 5138 was ever sued in any court by the party who initiated seizure of the property. See *infra,* at 77–78.

[5] Since the announcement of this Court's decision in *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337, summary prejudgment remedies have come under constitutional challenge throughout the country. The summary deprivation of property under statutes very similar to the Florida and Pennsylvania statutes at issue here has been held unconstitutional by at least two courts. *Laprease* v. *Raymours Furniture Co.,* 315 F. Supp. 716 (NDNY); *Blair* v. *Pitchess,* 5 Cal. 3d 258, 486 P. 2d 1242. But see *Brunswick Corp.* v. *J. & P., Inc.,* 424 F. 2d 100 (CA10); *Wheeler* v. *Adams Co.,* 322 F. Supp. 645 (Md.); *Almor Furniture & Appliances, Inc.* v. *MacMillan,* 116 N. J. Super. 65, 280 A. 2d 862. Applying *Sniadach* to other closely related forms of summary prejudgment remedies, some courts have construed that decision as setting forth general principles of procedural due process and have struck down such remedies. *E. g., Adams* v. *Egley,* 338 F. Supp. 614 (SD Cal.); *Collins* v. *The Viceroy Hotel Corp.,* 338 F. Supp. 390 (ND Ill.); *Santiago* v. *McElroy,* 319 F. Supp. 284 (ED Pa.); *Klim* v. *Jones,* 315 F. Supp. 109 (ND Cal.); *Randone* v. *Appellate Dept.,* 5 Cal. 3d 536, 488 P. 2d 13; *Larson* v. *Fetherston,* 44 Wis. 2d 712, 172 N. W. 2d 20; *Jones Press Inc.* v. *Motor Travel Services Inc.,* 286 Minn. 205, 176 N. W. 2d 87. See *Lebowitz* v. *Forbes Leasing & Finance Corp.,* 326 F. Supp. 1335, 1341–1348 (ED Pa.). Other courts, however, have con-

## II

Under the Florida statute challenged here,[6] "[a]ny person whose goods or chattels are wrongfully detained by any other person . . . may have a writ of replevin to recover them . . . ." Fla. Stat. Ann. § 78.01 (Supp. 1972–1973). There is no requirement that the applicant make a convincing showing before the seiz-

strued *Sniadach* as closely confined to its own facts and have upheld such summary prejudgment remedies. *E. g., Reeves* v. *Motor Contract Co.,* 324 F. Supp. 1011 (ND Ga.); *Black Watch Farms* v. *Dick,* 323 F. Supp. 100 (Conn.); *American Olean Tile Co.* v. *Zimmerman,* 317 F. Supp. 150 (Hawaii); *Young* v. *Ridley,* 309 F. Supp. 1308 (DC); *Termplan, Inc.* v. *Superior Court of Maricopa County,* 105 Ariz. 270, 463 P. 2d 68; *300 West 154th Street Realty Co.* v. *Department of Buildings,* 26 N. Y. 2d 538, 260 N. E. 2d 534.

[6] The relevant Florida statutory provisions are the following:

Fla. Stat. Ann. § 78.01 (Supp. 1972–1973):

"Right to replevin.—Any person whose goods or chattels are wrongfully detained by any other person or officer may have a writ of replevin to recover them and any damages sustained by reason of the wrongful caption or detention as herein provided. Or such person may seek like relief, but with summons to defendant instead of replevy writ in which event no bond is required and the property shall be seized only after judgment, such judgment to be in like form as that provided when defendant has retaken the property on a forthcoming bond."

Fla. Stat. Ann. § 78.07 (Supp. 1972–1973):

"Bond; Requisites.—Before a replevy writ issues, plaintiff shall file a bond with surety payable to defendant to be approved by the clerk in at least double the value of the property to be replevied conditioned that plaintiff will prosecute his action to effect and without delay and that if defendant recovers judgment against him in the action, he will return the property, if return thereof is adjudged, and will pay defendant all sums of money recovered against plaintiff by defendant in the action."

Fla. Stat. Ann. § 78.08 (Supp. 1972–1973):

"Writ; form; return.—The writ shall command the officer to whom it may be directed to replevy the goods and chattels in pos-

ure that the goods are, in fact, "wrongfully de-tained." Rather, Florida law automatically relies on the bare assertion of the party seeking the writ that he is entitled to one and allows a court clerk to issue the writ summarily. It requires only that the applicant file a complaint, initiating a court action for repossession and reciting in conclusory fashion that he is "lawfully entitled to the possession" of the property, and that he file a security bond

> "in at least double the value of the property to be replevied conditioned that plaintiff will prosecute his action to effect and without delay and that if defendant recovers judgment against him in the action, he will return the property, if return thereof is adjudged, and will pay defendant all sums of money recovered against plaintiff by defendant in the action." Fla. Stat. Ann. § 78.07 (Supp. 1972–1973).

session of defendant, describing them, and to summon the defendant to answer the complaint."

Fla. Stat. Ann. § 78.10 (Supp. 1972–1973):

"Writ; execution on property in buildings, etc.—In executing the writ of replevin, if the property or any part thereof is secreted or concealed in any dwelling house or other building or enclosure, the officer shall publicly demand delivery thereof and if it is not delivered by the defendant or some other person, he shall cause such house, building or enclosure to be broken open and shall make replevin according to the writ; and if necessary, he shall take to his assistance the power of the county."

Fla. Stat. Ann. § 78.13 (Supp. 1972–1973):

"Writ; disposition of property levied on.—The officer executing the writ shall deliver the property to plaintiff after the lapse of three (3) days from the time the property was taken unless within the three (3) days defendant gives bond with surety to be approved by the officer in double the value of the property as appraised by the officer, conditioned to have the property forthcoming to abide the result of the action, in which event the property shall be redelivered to defendant."

On the sole basis of the complaint and bond, a writ is issued "command[ing] the officer to whom it may be directed to replevy the goods and chattels in possession of defendant . . . and to summon the defendant to answer the complaint." Fla. Stat. Ann. § 78.08 (Supp. 1972–1973). If the goods are "in any dwelling house or other building or enclosure," the officer is required to demand their delivery; but, if they are not delivered, "he shall cause such house, building or enclosure to be broken open and shall make replevin according to the writ . . . ." Fla. Stat. Ann. § 78.10 (Supp. 1972–1973).

Thus, at the same moment that the defendant receives the complaint seeking repossession of property through court action, the property is seized from him. He is provided no prior notice and allowed no opportunity whatever to challenge the issuance of the writ. *After* the property has been seized, he will eventually have an opportunity for a hearing, as the defendant in the trial of the court action for repossession, which the plaintiff is required to pursue. And he is also not wholly without recourse in the meantime. For under the Florida statute, the officer who seizes the property must keep it for three days, and during that period the defendant may reclaim possession of the property by posting his own security bond in double its value. But if he does not post such a bond, the property is transferred to the party who sought the writ, pending a final judgment in the underlying action for repossession. Fla. Stat. Ann. § 78.13 (Supp. 1972–1973).

The Pennsylvania law[7] differs, though not in its essential nature, from that of Florida. As in Florida,

---

[7] The basic Pennsylvania statutory provision regarding the issuance of writs of replevin is the following:

Pa. Stat. Ann., Tit. 12, § 1821. Writs of replevin authorized

"It shall and may be lawful for the justices of each county in this province to grant writs of replevin, in all cases whatsoever, where

a private party may obtain a prejudgment writ of replevin through a summary process of *ex parte* application to a prothonotary. As in Florida, the party seeking

replevins may be granted by the laws of England, taking security as the said law directs, and make them returnable to the respective courts of common pleas, in the proper county, there to be determined according to law." 

The procedural prerequisites to issuance of a prejudgment writ are, however, set forth in the Pennsylvania Rules of Civil Procedure. The relevant rules are the following:

"Rule 1073.  Commencement of Action

"(a) An action of replevin with bond shall be commenced by filing with the prothonotary a praecipe for a writ of replevin with bond, together with

"(1) the plaintiff's affidavit of the value of the property to be replevied, and

"(2) the plaintiff's bond in double the value of the property, with security approved by the prothonotary, naming the Commonwealth of Pennsylvania as obligee, conditioned that if the plaintiff fails to maintain his right of possession of the property, he shall pay to the party entitled thereto the value of the property and all legal costs, fees and damages sustained by reason of the issuance of the writ.

"(b) An action of replevin without bond shall be commenced by filing with the prothonotary

"(1) a praecipe for a writ of replevin without bond or

"(2) a complaint.

"If the action is commenced without bond, the sheriff shall not replevy the property but at any time before the entry of judgment the plaintiff, upon filing the affidavit and bond prescribed by subdivision (a) of this rule, may obtain a writ of replevin with bond, issued in the original action, and have the sheriff replevy the property.

"Rule 1076.  Counterbond

"(a) A counterbond may be filed with the prothonotary by a defendant or intervenor claiming the right to the possession of the property, except a party claiming only a lien thereon, within seventy-two (72) hours after the property has been replevied, or within seventy-two (72) hours after service upon the defendant when the taking of possession of the property by the sheriff has been waived by the plaintiff as provided by Rule 1077 (a), or within such extension of time as may be granted by the court upon cause shown.

"(b) The counterbond shall be in the same amount as the original

·the.writ may simply post ·with his application a bond in double the value of the property to be seized. Pa. Rule Civ. Proc. 1073 (a). There is no opportunity for a prior hearing and no prior notice to the other party. On this basis, a sheriff is required to execute the writ by seizing the specified property. Unlike the Florida statute,· however, the Pennsylvania law does not require that there *ever* be opportunity for a hearing on the merits of the conflicting claims to possession of ·the replevied property. The party seeking the writ is not obliged to initiate a court action for repossession.[8] In-

bond, with security · approved . by the prothonotary, naming the Commonwealth of Pennsylvania as obligee, conditioned that if the party filing it fails to maintain his right to possession of the property he shall pay to the party ·entitled thereto the value of the property, and all legal costs, fees and damages sustained by reason of the delivery of the replevied property to the party filing the counterbond.

"Rule 1077. Disposition of Replevied Property. Sheriff's Return

"(a) When a writ of replevin with bond is issued, the sheriff shall leave the property during the time allowed for the filing of a counterbond in the possession of the defendant or of any other person if the plaintiff so authorizes him in writing.

"(b) Property taken into possession by the sheriff shall be held by· him until the expiration of the time for filing a counterbond. If the property is not ordered to be impounded and if no counterbond is filed, the sheriff shall deliver the property to the plaintiff.

"(c) If the property is not ordered to be impounded and the person in possession files a counterbond, the property shall be delivered to him, but if he does not file a counterbond, the property shall be delivered to the party first filing a counterbond.

"(d) When perishable property is replevied the court may make such order relating to its sale or disposition as shall be proper.

"(e) The return of the sheriff to the writ of replevin with bond shall state the disposition made by him of the property and the name and address of any person found in possession of the property."

[8] Pa. Rule Civ. Proc. 1073 (b) does establish a procedure whereby an applicant may obtain a writ by filing a complaint, initiating a

deed, he need not even formally allege that he is lawfully entitled to the property. The most that is required is that he file an "affidavit of the value of the property to be replevied." Pa. Rule Civ. Proc. 1073 (a). If the party who loses property through replevin seizure is to get even a post-seizure hearing, he must initiate a lawsuit himself.[9] He may also, as under Florida law, post his own counterbond within three days after the seizure to regain possession. Pa. Rule Civ. Proc. 1076.

## III

Although these prejudgment replevin statutes are descended from the common-law replevin action of six centuries ago, they bear very little resemblance to it. Replevin at common law was an action for the return of specific goods wrongfully taken or "distrained." Typically, it was used after a landlord (the "distrainor") had seized possessions from a tenant (the "distrainee") to satisfy a debt allegedly owed. If the tenant then instituted a replevin action and posted security, the landlord could be ordered to return the property at

---

later court action. See n. 7, *supra*. In the case of every appellant in No. 70–5138, the applicant proceeded under Rule 1073 (a) rather than 1073 (b), seizing property under no more than a security bond and initiating no court action.

[9] Pa. Rule Civ. Proc. 1037 (a) establishes the procedure for initiating such a suit:

"If an action is not commenced by a complaint [under Rule 1073 (b)], the prothonotary, upon praecipe of the defendant, shall enter a rule upon the plaintiff to file a complaint. If a complaint is not filed within twenty (20) days after service of the rule, the prothonotary, upon praecipe of the defendant, shall enter a judgment of non pros."

None of the appellants in No. 70–5138 attempted to initiate the process to require the filing of a post-seizure complaint under Rule 1037 (a).

once, pending a final judgment in the underlying action.[10] However, this prejudgment replevin of goods at common law did *not* follow from an entirely *ex parte* process of pleading by the distrainee. For "[t]he distrainor could always stop the action of replevin by claiming to be the owner of the goods; and as this claim was often made merely to delay the proceedings, the writ *de proprietate probanda* was devised early in the fourteenth century, which enabled the sheriff to determine summarily the question of ownership. If the question of ownership was determined against the distrainor the goods were delivered back to the distrainee [pending final judgment]." 3 W. Holdsworth, History of English Law 284 (1927).

Prejudgment replevin statutes like those of Florida and Pennsylvania are derived from this ancient possessory action in that they authorize the seizure of property before a final judgment. But the similarity ends there. As in the present cases, such statutes are most commonly used by creditors to seize goods allegedly wrongfully detained—not wrongfully taken—by debtors. At common law, if a creditor wished to invoke state power to recover goods wrongfully detained, he had to proceed through the action of debt or detinue.[11] These actions, however, did not provide for a return of property before final judgment.[12] And, more importantly, on the occasions when the common law did allow prejudgment seizure by state power, it provided some kind

---

[10] See T. Plucknett, A Concise History of the Common Law 367–369 (1956); 3 W. Holdsworth, History of English Law 284–285 (1927); 2 F. Pollock & F. Maitland, History of English Law 577 (1909); J. Cobbey, Replevin 19–29 (1890).

[11] See Plucknett, *supra*, n. 10, at 362–365; Pollock & Maitland, *supra*, n. 10, at 173–175, 203–211.

[12] The creditor could, of course, proceed without the use of state power, through self-help, by "distraining" the property before a judgment. See n. 10, *supra*.

of notice and opportunity to be heard to the party then in possession of the property, and a state official made at least a summary determination of the relative rights of the disputing parties before stepping into the dispute and taking goods from one of them.

## IV

For more than a century the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Baldwin* v. *Hale,* 1 Wall. 223, 233. See *Windsor* v. *McVeigh,* 93 U. S. 274; *Hovey* v. *Elliott,* 167 U. S. 409; *Grannis* v. *Ordean,* 234 U. S. 385. It is equally fundamental that the right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong* v. *Manzo,* 380 U. S. 545, 552.

The primary question in the present cases is whether these state statutes are constitutionally defective in failing to provide for hearings "at a meaningful time." The Florida replevin process guarantees an opportunity for a hearing after the seizure of goods, and the Pennsylvania process allows a post-seizure hearing if the aggrieved party shoulders the burden of initiating one. But neither the Florida nor the Pennsylvania statute provides for notice or an opportunity to be heard *before* the seizure. The issue is whether procedural due process in the context of these cases requires an opportunity for a hearing *before* the State authorizes its agents to seize property in the possession of a person upon the application of another.

The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions. The purpose of this requirement is not

only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use and possession of property from arbitrary encroachment— to minimize substantively unfair or mistaken deprivations of property, a danger that is especially great when the State seizes goods simply upon the application of and for the benefit of a private party. So viewed, the prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference. See *Lynch* v. *Household Finance Corp.*, 405 U. S. 538, 552.

The requirement of notice and an opportunity to be heard raises no impenetrable barrier to the taking of a person's possessions. But the fair process of decision-making that it guarantees works, by itself, to protect against arbitrary deprivation of property. For when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented. It has long been recognized that "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . [And n]o better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U. S. 123, 170–172 (Frankfurter, J., concurring).

If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place. Damages may even be

awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred. "This Court has not . . . embraced the general proposition that a wrong may be done if it can be undone." *Stanley* v. *Illinois,* 405 U. S. 645, 647.

This is no new principle of constitutional law. The right to a prior hearing has long been recognized by this Court under the Fourteenth and Fifth Amendments. Although the Court has held that due process tolerates variances in the *form* of a hearing "appropriate to the nature of the case," *Mullane* v. *Central Hanover Tr. Co.,* 339 U. S. 306, 313, and "depending upon the importance of the interests involved and the nature of the subsequent proceedings [if any]," *Boddie* v. *Connecticut,* 401 U. S. 371, 378, the Court has traditionally insisted that, whatever its form, opportunity for that hearing must be provided before the deprivation at issue takes effect. *E. g., Bell* v. *Burson,* 402 U. S. 535, 542; *Wisconsin* v. *Constantineau,* 400 U. S. 433, 437; *Goldberg* v. *Kelly,* 397 U. S. 254; *Armstrong* v. *Manzo,* 380 U. S., at 551; *Mullane* v. *Central Hanover Tr. Co., supra,* at 313; *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 152–153; *United States* v. *Illinois Central R. Co.,* 291 U. S. 457, 463; *Londoner* v. *City & County of Denver,* 210 U. S. 373, 385–386. See *In re Ruffalo,* 390 U. S. 544, 550–551. "That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Boddie* v. *Connecticut, supra,* at 378–379 (emphasis in original).

The Florida and Pennsylvania prejudgment replevin statutes fly in the face of this principle. To be sure, the requirements that a party seeking a writ must first post a bond, allege conclusorily that he is entitled to specific goods, and open himself to possible liability in damages if he is wrong, serve to deter wholly unfounded applications for a writ. But those requirements are hardly a substitute for a prior hearing, for they test no more than the strength of the applicant's own belief in his rights.[13] Since his private gain is at stake, the danger is all too great that his confidence in his cause will be misplaced. Lawyers and judges are familiar with the phenomenon of a party mistakenly but firmly convinced that his view of the facts and law will prevail, and therefore quite willing to risk the costs of litigation. Because of the understandable, self-interested fallibility of litigants, a court does not decide a dispute until it has had an opportunity to hear both sides—and does not generally take even tentative action until it has itself examined the support for the plaintiff's position. The Florida and Pennsylvania statutes do not even require the official issuing a writ of replevin to do that much.

The minimal deterrent effect of a bond requirement is, in a practical sense, no substitute for an informed evaluation by a neutral official. More specifically, as a matter of constitutional principle, it is no replacement for the right to a prior hearing that is the only truly effective safeguard against arbitrary deprivation of property. While the existence of these other, less

---

[13] They may not even test that much. For if an applicant for the writ knows that he is dealing with an uneducated, uninformed consumer with little access to legal help and little familiarity with legal procedures, there may be a substantial possibility that a summary seizure of property—however unwarranted—may go unchallenged, and the applicant may feel that he can act with impunity.

effective, safeguards may be among the considerations that affect the form of hearing demanded by due process, they are far from enough by themselves to obviate the right to a prior hearing of some kind.

## V

The right to a prior hearing, of course, attaches only to the deprivation of an interest encompassed within the Fourteenth Amendment's protection. In the present cases, the Florida and Pennsylvania statutes were applied to replevy chattels in the appellants' possession. The replevin was not cast as a final judgment; most, if not all, of the appellants lacked full title to the chattels; and their claim even to continued possession was a matter in dispute. Moreover, the chattels at stake were nothing more than an assortment of household goods. Nonetheless, it is clear that the appellants were deprived of possessory interests in those chattels that were within the protection of the Fourteenth Amendment.

## A

A deprivation of a person's possessions under a prejudgment writ of replevin, at least in theory, may be only temporary. The Florida and Pennsylvania statutes do not require a person to wait until a post-seizure hearing and final judgment to recover what has been replevied. Within three days after the seizure, the statutes allow him to recover the goods if he, in return, surrenders other property—a payment necessary to secure a bond in double the value of the goods seized from him.[14] But it is now

---

[14] The appellants argue that this opportunity for quick recovery exists only in theory. They allege that very few people in their position are able to obtain a recovery bond, even if they know of the possibility. Appellant Fuentes says that in her case she was never told that she could recover the stove and stereo and that the deputy sheriff seizing them gave them at once to the Firestone agent, rather

well settled that a temporary, nonfinal deprivation of property is nonetheless a "deprivation" in the terms of the Fourteenth Amendment. *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337; *Bell* v. *Burson*, 402 U. S. 535. Both *Sniadach* and *Bell* involved takings of property pending a final judgment in an underlying dispute. In both cases, the challenged statutes included recovery provisions, allowing the defendants to post security to quickly regain the property taken from them.[15] Yet the Court firmly held that these were deprivations of property that had to be preceded by a fair hearing.

The present cases are no different. When officials of Florida or Pennsylvania seize one piece of property from a person's possession and then agree to return it if he surrenders another, they deprive him of property whether or not he has the funds, the knowledge, and the time needed to take advantage of the recovery provision.

---

than holding them for three days. She further asserts that of 442 cases of prejudgment replevin in small-claims courts in Dade County, Florida, in 1969, there was not one case in which the defendant took advantage of the recovery provision.

[15] *Bell* v. *Burson*, 402 U. S. 535, 536. Although not mentioned in the *Sniadach* opinion, there clearly was a quick-recovery provision in the Wisconsin prejudgment garnishment statute at issue. Wis. Stat. Ann. § 267.21 (1) (Supp. 1970–1971). *Family Finance Corp.* v. *Sniadach*, 37 Wis. 2d 163, 173–174, 154 N. W. 2d 259, 265. Mr. Justice Harlan adverted to the recovery provision in his concurring opinion. 395 U. S., at 343.

These sorts of provisions for recovery of property by posting security are, of course, entirely different from the security requirement upheld in *Lindsey* v. *Normet*, 405 U. S. 56, 65. There, the Court upheld a requirement that a tenant wanting a continuance of an eviction hearing must post security for accruing rent during the continuance. The tenant did not have to post security in order to remain in possession before a hearing; rather, he had to post security only in order to obtain a *continuance* of the hearing. Moreover, the security requirement in *Lindsey* was not a *recovery* provision. For the tenant was not deprived of his possessory interest even for one day without opportunity for a hearing.

The Fourteenth Amendment draws no bright lines around three-day, 10-day or 50-day deprivations of property. Any significant taking of property by the State is within the purview of the Due Process Clause. While the length and consequent severity of a deprivation may be another factor to weigh in determining the appropriate form of hearing, it is not decisive of the basic right to a prior hearing of some kind.

### B

The appellants who signed conditional sales contracts lacked full legal title to the replevied goods. The Fourteenth Amendment's protection of "property," however, has never been interpreted to safeguard only the rights of undisputed ownership. Rather, it has been read broadly to extend protection to "any significant property interest," *Boddie* v. *Connecticut*, 401 U. S., at 379, including statutory entitlements. See *Bell* v. *Burson*, 402 U. S., at 539; *Goldberg* v. *Kelly*, 397 U. S., at 262.

The appellants were deprived of such an interest in the replevied goods—the interest in continued possession and use of the goods. See *Sniadach* v. *Family Finance Corp.*, 395 U. S., at 342 (Harlan, J., concurring). They had acquired this interest under the conditional sales contracts that entitled them to possession and use of the chattels before transfer of title. In exchange for immediate possession, the appellants had agreed to pay a major financing charge beyond the basic price of the merchandise. Moreover, by the time the goods were summarily repossessed, they had made substantial installment payments. Clearly, their possessory interest in the goods, dearly bought and protected by contract,[16]

---

[16] The possessory interest of Rosa Washington, an appellant in No. 5138, in her son's clothes, furniture, and toys was no less sufficient to invoke due process safeguards. Her interest was not protected by contract. Rather, it was protected by ordinary property law,

was sufficient to invoke the protection of the Due Process Clause.

Their ultimate right to continued possession was, of course, in dispute. If it were shown at a hearing that the appellants had defaulted on their contractual obligations, it might well be that the sellers of the goods would be entitled to repossession. But even assuming that the appellants had fallen behind in their installment payments, and that they had no other valid defenses,[17] that is immaterial here. The right to be heard does not depend upon an advance showing that one will surely prevail at the hearing. "To one who protests against the taking of his property without due process of law, it is no answer to say that in his particular case due process of law would have led to the same result because he had no adequate defense upon the merits." *Coe* v. *Armour Fertilizer Works*, 237 U. S. 413, 424. It is enough to invoke the procedural safeguards of the Fourteenth Amendment that a significant property interest is at stake, whatever the ultimate outcome of a hearing on the contractual right to continued possession and use of the goods.[18]

---

there being a dispute between her and her estranged husband over which of them had a legal right not only to custody of the child but also to possession of the chattels.

[17] Mrs. Fuentes argues that Florida law allows her to defend on the ground that Firestone breached its obligations under the sales contract by failing to repair serious defects in the stove it sold her. We need not consider this issue here. It is enough that the right to continued possession of the goods was open to *some* dispute at a hearing since the sellers of the goods had to show, at the least, that the appellants had defaulted in their payments.

[18] The issues decisive of the ultimate right to continued possession, of course, may be quite simple. The simplicity of the issues might be relevant to the formality or scheduling of a prior hearing. See *Lindsey* v. *Normet*, 405 U. S., at 65. But it certainly cannot undercut the right to a prior hearing of some kind.

## C

Nevertheless, the District Courts rejected the appellants' constitutional claim on the ground that the goods seized from them—a stove, a stereo, a table, a bed, and so forth—were not deserving of due process protection, since they were not absolute necessities of life. The courts based this holding on a very narrow reading of *Sniadach* v. *Family Finance Corp., supra,* and *Goldberg* v. *Kelly, supra,* in which this Court held that the Constitution requires a hearing before prejudgment wage garnishment and before the termination of certain welfare benefits. They reasoned that *Sniadach* and *Goldberg,* as a matter of constitutional principle, established no more than that a prior hearing is required with respect to the deprivation of such basically "necessary" items as wages and welfare benefits.

This reading of *Sniadach* and *Goldberg* reflects the premise that those cases marked a radical departure from established principles of procedural due process. They did not. Both decisions were in the mainstream of past cases, having little or nothing to do with the absolute "necessities" of life but establishing that due process requires an opportunity for a hearing before a deprivation of property takes effect.[19]  *E. g., Opp Cotton Mills* v. *Administrator,* 312 U. S., at 152–153; *United States* v. *Illinois Central R. Co.,* 291 U. S., at 463; *Southern R. Co.* v. *Virginia,* 290 U. S. 190; *Londoner* v. *City & County of Denver,* 210 U. S. 373; *Central of Georgia* v. *Wright,* 207 U. S. 127; *Security Trust*

---

[19] The Supreme Court of California recently put the matter accurately: "*Sniadach* does not mark a radical departure in constitutional adjudication. It is not a rivulet of wage garnishment but part of the mainstream of the past procedural due process decisions of the United States Supreme Court." *Randone* v. *Appellate Dept.,* 5 Cal. 3d 536, 550, 488 P. 2d 13, 22.

*Co.* v. *Lexington,* 203 U. S. 323; *Hibben* v. *Smith,* 191 U. S. 310; *Glidden* v. *Harrington,* 189 U. S. 255. In none of those cases did the Court hold that this most basic due process requirement is limited to the protection of only a few types of property interests. While *Sniadach* and *Goldberg* emphasized the special importance of wages and welfare benefits, they did not convert that emphasis into a new and more limited constitutional doctrine.[20]

Nor did they carve out a rule of "necessity" for the sort of nonfinal deprivations of property that they involved. That was made clear in *Bell* v. *Burson,* 402 U. S. 535, holding that there must be an opportunity for a fair hearing before mere suspension of a driver's license. A driver's license clearly does not rise to the level of "necessity" exemplified by wages and welfare benefits. Rather, as the Court accurately stated, it is an "important interest," *id.,* at 539, entitled to the protection of procedural due process of law.

The household goods, for which the appellants contracted and paid substantial sums, are deserving of similar protection. While a driver's license, for example, "may become [indirectly] essential in the pursuit of a livelihood," *ibid.,* a stove or a bed may be equally essential to provide a minimally decent environment for human beings in their day-to-day lives. It is, after all, such consumer goods that people work and earn a livelihood in order to acquire.

No doubt, there may be many gradations in the "importance" or "necessity" of various consumer goods. Stoves could be compared to television sets, or beds

---

[20] *Sniadach* v. *Family Finance Corp., supra,* at 340; *Goldberg* v. *Kelly,* 397 U. S. 254, 264. Of course, the primary issue in *Goldberg* was the form of hearing demanded by due process before termination of welfare benefits; the importance of welfare was directly relevant to that question.

could be compared to tables. But if the root principle of procedural due process is to be applied with objectivity, it cannot rest on such distinctions. The Fourteenth Amendment speaks of "property" generally. And, under our free-enterprise system, an individual's choices in the marketplace are respected, however unwise they may seem to someone else. It is not the business of a court adjudicating due process rights to make its own critical evaluation of those choices and protect only the ones that, by its own lights, are "necessary." [21]

## VI

There are "extraordinary situations" that justify postponing notice and opportunity for a hearing. *Boddie* v. *Connecticut,* 401 U. S., at 379. These situations, however, must be truly unusual.[22] Only in a few limited sit-

---

[21] The relative weight of liberty or property interests is relevant, of course, to the form of notice and hearing required by due process. See, *e. g., Boddie* v. *Connecticut,* 401 U. S. 371, 378, and cases cited therein. But *some* form of notice and hearing—formal or informal— is required before deprivation of a property interest that "cannot be characterized as *de minimis." Sniadach* v. *Family Finance Corp., supra,* at 342 (Harlan, J., concurring).

[22] A prior hearing always imposes some costs in time, effort, and expense, and it is often more efficient to dispense with the opportunity for such a hearing. But these rather ordinary costs cannot outweigh the constitutional right. See *Bell* v. *Burson, supra,* at 540– 541; *Goldberg* v. *Kelly, supra,* at 261. Procedural due process is not intended to promote efficiency or accommodate all possible interests: it is intended to protect the particular interests of the person whose possessions are about to be taken.

"The establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of

uations has this Court allowed outright seizure [23] without opportunity for a prior hearing. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. Thus, the Court has allowed summary seizure of property

a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." *Stanley* v. *Illinois*, 405 U. S. 645, 656.

[23] Of course, outright seizure of property is not the only kind of deprivation that must be preceded by a prior hearing. See, *e. g.*, *Sniadach* v. *Family Finance Corp., supra.* In three cases, the Court has allowed the attachment of property without a prior hearing. In one, the attachment was necessary to protect the public against the same sort of immediate harm involved in the seizure cases—a bank failure. *Coffin Bros. & Co.* v. *Bennett*, 277 U. S. 29. Another case involved attachment necessary to secure jurisdiction in state court—clearly a most basic and important public interest. *Ownbey* v. *Morgan*, 256 U. S. 94. It is much less clear what interests were involved in the third case, decided with an unexplicated *per curiam* opinion simply citing *Coffin Bros.* and *Ownbey. McKay* v. *McInnes*, 279 U. S. 820. As far as essential procedural due process doctrine goes, *McKay* cannot stand for any more than was established in the *Coffin Bros.* and *Ownbey* cases on which it relied completely. See *Sniadach* v. *Family Finance Corp., supra,* at 340; *id.*, at 344 (Harlan, J., concurring).

In cases involving deprivation of other interests, such as government employment, the Court similarly has required an unusually important governmental need to outweigh the right to a prior hearing. See, *e. g., Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 895–896.

Seizure under a search warrant is quite a different matter, see n. 30, *infra*.

to collect the internal revenue of the United States,[24] to meet the needs of a national war effort,[25] to protect against the economic disaster of a bank failure,[26] and to protect the public from misbranded drugs[27] and contaminated food.[28]

The Florida and Pennsylvania prejudgment replevin statutes serve no such important governmental or general public interest. They allow summary seizure of a person's possessions when no more than private gain is directly at stake.[29] The replevin of chattels, as in the

[24] *Phillips* v. *Commissioner*, 283 U. S. 589. The Court stated that "[d]elay in the judicial determination of property rights is not uncommon where it is *essential* that governmental needs be *immediately* satisfied." *Id.*, at 597 (emphasis supplied). The Court, then relied on "the need of the government promptly to secure its revenues." *Id.*, at 596.

[25] *Central Union Trust Co.* v. *Garvan*, 254 U. S. 554, 566; *Stoehr* v. *Wallace*, 255 U. S. 239, 245; *United States* v. *Pfitsch*, 256 U. S. 547, 553.

[26] *Fahey* v. *Mallonee*, 332 U. S. 245.

[27] *Ewing* v. *Mytinger & Casselberry, Inc.*, 339 U. S. 594.

[28] *North American Storage Co.* v. *Chicago*, 211 U. S. 306.

[29] By allowing repossession without an opportunity for a prior hearing, the Florida and Pennsylvania statutes may be intended specifically to reduce the costs for the private party seeking to seize goods in another party's possession. Even if the private gain at stake in repossession actions were equal to the great public interests recognized in this Court's past decisions, see nn. 24–28, *supra*, the Court has made clear that the avoidance of the ordinary costs imposed by the opportunity for a hearing is not sufficient to override the constitutional right. See n. 22, *supra*. The appellees argue that the cost of holding hearings may be especially onerous in the context of the creditor-debtor relationship. But the Court's holding in *Sniadach* v. *Family Finance Corp.*, *supra*, indisputably demonstrates that ordinary hearing costs are no more able to override due process rights in the creditor-debtor context than in other contexts.

In any event, the aggregate cost of an opportunity to be heard before repossession should not be exaggerated. For we deal here only with the right to an *opportunity* to be heard. Since the issues

present cases, may satisfy a debt or settle a score. But state intervention in a private dispute hardly compares to state action furthering a war effort or protecting the public health.

Nor do the broadly drawn Florida and Pennsylvania statutes limit the summary seizure of goods to special situations demanding prompt action. There may be cases in which a creditor could make a showing of immediate danger that a debtor will destroy or conceal disputed goods. But the statutes before us are not "narrowly drawn to meet any such unusual condition." *Sniadach* v. *Family Finance Corp., supra,* at 339. And no such unusual situation is presented by the facts of these cases.

The statutes, moreover, abdicate effective state control over state power. Private parties, serving their own private advantage, may unilaterally invoke state power to replevy goods from another. No state official participates in the decision to seek a writ; no state official reviews the basis for the claim to repossession; and no state official evaluates the need for immediate seizure. There is not even a requirement that the plaintiff provide any information to the court on these matters. The State acts largely in the dark.[30]

_____

and facts decisive of rights in repossession suits may very often be quite simple, there is a likelihood that many defendants would forgo their opportunity, sensing the futility of the exercise in the particular case. And, of course, no hearing need be held unless the defendant, having received notice of his opportunity, takes advantage of it.

[30] The seizure of possessions under a writ of replevin is entirely different from the seizure of possessions under a search warrant. First, a search warrant is generally issued to serve a highly important governmental need—*e. g.,* the apprehension and conviction of criminals—rather than the mere private advantage of a private party in an economic transaction. Second, a search warrant is generally issued in situations demanding prompt action. The danger is all too obvious that a criminal will destroy or hide evidence or

## VII

Finally, we must consider the contention that the appellants who signed conditional sales contracts thereby waived their basic procedural due process rights. The contract signed by Mrs. Fuentes provided that "in the event of default of any payment or payments, Seller at its option may take back the merchandise . . . ." The contracts signed by the Pennsylvania appellants similarly provided that the seller "may retake" or "repossess" the merchandise in the event of a "default in any payment." These terms were parts of printed form contracts, appearing in relatively small type and unaccompanied by any explanations clarifying their meaning.

In *D. H. Overmyer Co.* v. *Frick Co.*, 405 U. S. 174, the Court recently outlined the considerations relevant to determination of a contractual waiver of due process rights. Applying the standards governing waiver of constitutional rights in a criminal proceeding [31]—although not holding that such standards must necessarily apply—the Court held that, on the particular facts of that case, the contractual waiver of due process

---

fruits of his crime if given any prior notice. Third, the Fourth Amendment guarantees that the State will not issue search warrants merely upon the conclusory application of a private party. It guarantees that the State will not abdicate control over the issuance of warrants and that no warrant will be issued without a prior showing of probable cause. Thus, our decision today in no way implies that there must be opportunity for an adversary hearing before a search warrant is issued. But cf. *A Quantity of Books* v. *Kansas*, 378 U. S. 205.

[31] See *Brady* v. *United States*, 397 U. S. 742, 748; *Johnson* v. *Zerbst*, 304 U. S. 458, 464. In the civil area, the Court has said that "[w]e do not presume acquiescence in the loss of fundamental rights," *Ohio Bell Tel. Co.* v. *Public Utilities Comm'n*, 301 U. S. 292, 307. Indeed, in the civil no less than the criminal area, "courts indulge every reasonable presumption against waiver." *Aetna Ins. Co.* v. *Kennedy*, 301 U. S. 389, 393.

rights was "voluntarily, intelligently, and knowingly" made. *Id.*, at 187. The contract in *Overmyer* was negotiated between two corporations; the waiver provision was specifically bargained for and drafted by their lawyers in the process of these negotiations. As the Court noted, it was "not a case of unequal bargaining power or overreaching. The Overmyer-Frick agreement, from the start, was not a contract of adhesion." *Id.*, at 186. Both parties were "aware of the significance" of the waiver provision. *Ibid.*

The facts of the present cases are a far cry from those of *Overmyer.* There was no bargaining over contractual terms between the parties who, in any event, were far from equal in bargaining power. The purported waiver provision was a printed part of a form sales contract and a necessary condition of the sale. The appellees made no showing whatever that the appellants were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights.

The Court in *Overmyer* observed that "where the contract is one of adhesion, where there is great disparity in bargaining power, and where the debtor receives nothing for the [waiver] provision, other legal consequences may ensue." *Id.*, at 188. Yet, as in *Overmyer,* there is no need in the present cases to canvass those consequences fully. For a waiver of constitutional rights in any context must, at the very *least,* be clear. We need not concern ourselves with the involuntariness or unintelligence of a waiver when the contractual language relied upon does not, on its face, even amount to a waiver.

The conditional sales contracts here simply provided that upon a default the seller "may take back," "may retake" or "may repossess" merchandise. The contracts

included nothing about the waiver of a prior hearing. They did not indicate *how* or *through what process*— a final judgment, self-help, prejudgment replevin with a prior hearing, or prejudgment replevin without a prior hearing—the seller could take back the goods. Rather, the purported waiver provisions here are no more than a statement of the seller's right to repossession upon occurrence of certain events. The appellees do not suggest that these provisions waived the appellants' right to a full post-seizure hearing to determine whether those events had, in fact, occurred and to consider any other available defenses. By the same token, the language of the purported waiver provisions did not waive the appellants' constitutional right to a preseizure hearing of some kind.

## VIII

We hold that the Florida and Pennsylvania prejudgment replevin provisions work a deprivation of property without due process of law insofar as they deny the right to a prior opportunity to be heard before chattels are taken from their possessor.[32] Our holding, however, is a narrow one. We do not question the power of a State to seize goods before a final judgment in order to protect the security interests of creditors so long as those creditors have tested their claim to the goods through the process of a fair prior hearing. The nature and form of such prior hearings, moreover, are legitimately open to many potential variations and are a

---

[32] We do not reach the appellants' argument that the Florida and Pennsylvania statutory procedures violate the Fourth Amendment, made applicable to the States by the Fourteenth. See n. 2, *supra*. For once a prior hearing is required, at which the applicant for a writ must establish the probable validity of his claim for repossession, the Fourth Amendment problem may well be obviated. There is no need for us to decide that question at this point.

subject, at this point, for legislation—not adjudication.[33] Since the essential reason for the requirement of a prior hearing is to prevent unfair and mistaken deprivations of property, however, it is axiomatic that the hearing must provide a real test. "[D]ue process is afforded only by the kinds of 'notice' and 'hearing' that are aimed at establishing the validity, or at least the probable validity, of the underlying claim against the alleged debtor *before* he can be deprived of his property . . . ." *Sniadach* v. *Family Finance Corp.*, *supra*, at 343 (Harlan, J., concurring). See *Bell* v. *Burson*, *supra*, at 540; *Goldberg* v. *Kelly*, *supra*, at 267.

For the foregoing reasons, the judgments of the District Courts are vacated and these cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST did not participate in the consideration or decision of these cases.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, dissenting.

Because the Court's opinion and judgment improvidently, in my view, call into question important aspects of the statutes of almost all the States governing secured transactions and the procedure for repossessing personal property, I must dissent for the reasons that follow.

First: It is my view that when the federal actions were filed in these cases and the respective District

---

[33] Leeway remains to develop a form of hearing that will minimize unnecessary cost and delay while preserving the fairness and effectiveness of the hearing in preventing seizures of goods where the party seeking the writ has little probability of succeeding on the merits of the dispute.

Courts proceeded to judgment there were state court proceedings in progress. It seems apparent to me that the judgments should be vacated and the District Courts instructed to reconsider these cases in the light of the principles announced in *Younger* v. *Harris,* 401 U. S. 37 (1971); *Samuels* v. *Mackell,* 401 U. S. 66; *Boyle* v. *Landry,* 401 U. S. 77; and *Perez* v. *Ledesma,* 401 U. S. 82.

In No. 70–5039, the Florida statutes provide for the commencement of an action of replevin, with bond, by serving a writ summoning the defendant to answer the complaint. Thereupon the sheriff may seize the property, subject to repossession by defendant within three days upon filing of a counterbond, failing which the property is delivered to plaintiff to await final judgment in the replevin action. Fla. Stat. Ann. § 78.01 *et seq.* (Supp. 1972–1973). This procedure was attacked in a complaint filed by appellant Fuentes in the federal court, alleging that an affidavit in replevin had been filed by Firestone Tire & Rubber Co. in the Small Claims Court of Dade County; that a writ of replevin had been issued pursuant thereto and duly served, together with the affidavit and complaint; and that a trial date had been set in the Small Claims Court. Firestone's answer admitted that the replevin action was pending in the Small Claims Court and asserted that Mrs. Fuentes, plaintiff in the federal court and appellant here, had not denied her default or alleged that she had the right to possession of the property. Clearly, state court proceedings were pending, no bad faith or harassment was alleged, and no irreparable injury appeared that could not have been averted by raising constitutional objections in the pending state court proceeding. In this posture, it would appear that the case should be reconsidered under *Younger* v. *Harris* and companion cases, which were announced after the District Court's judgment.

In No. 70–5138, Pennsylvania Rule of Civil Procedure 1073 expressly provides that an "[a]ction of replevin with bond shall be commenced by filing with the prothonotary a praecipe for a writ of replevin with bond . . . ." When the writ issues and is served, the defendant has three days to file a counterbond and should he care to have a hearing he may file his own praecipe, in which event the plaintiff must proceed further in the action by filing and serving his complaint.

In the cases before us, actions in replevin were commenced in accordance with the rules, and appellee Sears, Roebuck & Co. urged in the District Court that plaintiffs had "adequate remedies at law which they could pursue in the state court proceedings which are still pending in accordance with the statutes and rules of Pennsylvania." App. 60. Under *Younger* v. *Harris* and companion cases, the District Court's judgment should be vacated and the case reconsidered.

Second: It goes without saying that in the typical installment sale of personal property both seller and buyer have interests in the property until the purchase price is fully paid, the seller early in the transaction often having more at stake than the buyer. Nor is it disputed that the buyer's right to possession is conditioned upon his making the stipulated payments and that upon default the seller is entitled to possession. Finally, there is no question in these cases that if default is disputed by the buyer he has the opportunity for a full hearing, and that if he prevails he may have the property or its full value as damages.

The narrow issue, as the Court notes, is whether it comports with due process to permit the seller, pending final judgment, to take possession of the property through a writ of replevin served by the sheriff without affording the buyer opportunity to insist that the seller establish at a hearing that there is reasonable

basis for his claim of default. The interests of the buyer and seller are obviously antagonistic during this interim period: the buyer wants the use of the property pending final judgment; the seller's interest is to prevent further use and deterioration of his security. By the Florida and Pennsylvania laws the property is to all intents and purposes placed in custody and immobilized during this time. The buyer loses use of the property temporarily but is protected against loss; the seller is protected against deterioration of the property but must undertake by bond to make the buyer whole in the event the latter prevails.

In considering whether this resolution of conflicting interests is unconstitutional, much depends on one's perceptions of the practical considerations involved. The Court holds it constitutionally essential to afford opportunity for a probable-cause hearing prior to repossession. Its stated purpose is "to prevent unfair and mistaken deprivations of property." But in these typical situations, the buyer-debtor has either defaulted or he has not. If there is a default, it would seem not only "fair," but essential, that the creditor be allowed to repossess; and I cannot say that the likelihood of a mistaken claim of default is sufficiently real or recurring to justify a broad constitutional requirement that a creditor do more than the typical state law requires and permits him to do. Sellers are normally in the business of selling and collecting the price for their merchandise. I could be quite wrong, but it would not seem in the creditor's interest for a default occasioning repossession to occur; as a practical matter it would much better serve his interests if the transaction goes forward and is completed as planned. Dollar-and-cents considerations weigh heavily against false claims of default as well as against precipitate action that would allow no opportunity for mistakes to surface and be

corrected.\* Nor does it seem to me that creditors would lightly undertake the expense of instituting replevin actions and putting up bonds.

The Court relies on prior cases, particularly *Goldberg* v. *Kelly,* 397 U. S. 254 (1970); *Bell* v. *Burson,* 402 U. S. 535 (1971); and *Stanley* v. *Illinois,* 405 U. S. 645 (1972). But these cases provide no automatic test for determining whether and when due process of law requires adversary proceedings. Indeed, "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. . . ." "[W]hat procedures due process may require under any given set of circumstances must begin

---

\*Appellants Paul and Ellen Parham admitted in their complaints that they were delinquent in their payments. They stipulated to this effect as well as to receipt of notices of delinquency prior to institution of the replevin action, and the District Court so found.

Appellant Epps alleged in his complaint that he was not in default. The defendant, Government Employees Exchange Corp., answered that Epps was in default in the amount of $311.25 as of August 9, 1970, that the entire sum due had been demanded in accordance with the relevant documents, and that Epps had failed and refused to pay that sum. The District Court did not resolve this factual dispute. It did find that Epps earned in excess of $10,000 per year and that the agreements Epps and Parham entered into complied with the provisions of Pennsylvania's Uniform Commercial Code and its Services and Installment Sales Act.

As for appellant Rosa Washington, the District Court, based on the allegations of her complaint, entered a temporary restraining order requiring that the property seized from her be returned forthwith. At a subsequent hearing the order was dissolved, the court finding "that the representations upon which the temporary restraining order of September 18, 1970, issued were incorrect, both as to allegations contained in the complaint and representations made by counsel." (App. 29.)

It was stipulated between appellant Fuentes and defendants in the District Court that Mrs. Fuentes was in default at the time the replevin action was filed and that notices to this effect were sent to her over several months prior to institution of the suit. (App. 25–26.)

with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961). See also *Stanley* v. *Illinois, supra,* at 650; *Goldberg* v. *Kelly, supra,* at 263. Viewing the issue before us in this light, I would not construe the Due Process Clause to require the creditors to do more than they have done in these cases to secure possession pending final hearing. Certainly, I would not ignore, as the Court does, the creditor's interest in preventing further use and deterioration of the property in which he has substantial interest. Surely under the Court's own definition, the creditor has a "property" interest as deserving of protection as that of the debtor. At least the debtor, who is very likely uninterested in a speedy resolution that could terminate his use of the property, should be required to make those payments, into court or otherwise, upon which his right to possession is conditioned. Cf. *Lindsey* v. *Normet,* 405 U. S. 56 (1972).

Third: The Court's rhetoric is seductive, but in end analysis, the result it reaches will have little impact and represents no more than ideological tinkering with state law. It would appear that creditors could withstand attack under today's opinion simply by making clear in the controlling credit instruments that they may retake possession without a hearing, or, for that matter, without resort to judicial process at all. Alternatively, they need only give a few days' notice of a hearing, take possession if hearing is waived or if there is default; and if hearing is necessary merely establish probable cause for asserting that default has occurred. It is very doubtful in my mind that such a hearing would in fact result in protections for the debtor substantially different from those the present laws pro-

vide. On the contrary, the availability of credit may well be diminished or, in any event, the expense of securing it increased.

None of this seems worth the candle to me. The procedure that the Court strikes down is not some barbaric hangover from bygone days. The respective rights of the parties in secured transactions have undergone the most intensive analysis in recent years. The Uniform Commercial Code, which now so pervasively governs the subject matter with which it deals, provides in Art. 9, § 9–503, that:

> "Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. . . ."

Recent studies have suggested no changes in Art. 9 in this respect. See Permanent Editorial Board for the Uniform Commercial Code, Review Committee for Article 9 of the Uniform Commercial Code, Final Report, § 9–503 (April 25, 1971). I am content to rest on the judgment of those who have wrestled with these problems so long and often and upon the judgment of the legislatures that have considered and so recently adopted provisions that contemplate precisely what has happened in these cases.