**Enrique VELAZCO et al., Plaintiffs, Appellants,**

v.

**Steven A. MINTER, etc., Defendant, Appellee.**

**No. 73–1018.**

United States Court of Appeals, First Circuit.

Heard April 10, 1973.

Decided June 26, 1973.

**574**

Paula W. Gold, Boston, Mass., with whom R. Peter Anderson, Boston, Mass. was on brief, for appellants.

Kenneth A. Behar, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., and Walter H. Mayo, III, Asst. Atty. Gen., Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, Mc-ENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Plaintiff and the class he represents are recipients both of federally administered Old Age, Survivors and Disability Insurance (OASDI) benefits and of Old Age Assistance (OAA) benefits, administered by the defendant, the Massachusetts Commissioner of Public Welfare.[1] The issue in this case is whether a general notice to these recipients in September of 1972, alerting them to both forthcoming reductions in their OAA checks and net increases in their combined OASDI and OAA benefits, both in unspecified amounts, resulting from program-wide changes in both OASDI and

1. The OAA program is Title I and the OASDI program Title II of the Social Security Act. 49 Stat. 620; 42 U.S.C. §§ 301–431.

OAA, met constitutional and regulatory standards.

In the autumn of 1972 in Massachusetts, a series of adjustments became necessary for some 61,000 persons who, like plaintiff, received both OASDI and OAA. The Congress had, on July 1, enacted P.L. 92–336, 86 Stat. 406, effective September 1, increasing OASDI benefits by 20 per cent. Since OAA benefits respond to actual need, increases in income from other sources such as OASDI must be reflected by downward adjustments of OAA benefits. At about the same time, on July 18, the Commonwealth of Massachusetts augmented monthly benefits under its OAA program, effective October 15, by (1) mandating that $7.50 in certain non-OAA income be disregarded for purposes of calculating OAA benefits; (2) raising a recipient's transportation allowance $5.00; and (3) allowing a 3 per cent cost of living increase. Ch. 788, Mass. Acts of 1972; M.G.L.A. c. 118A § 1 (1973 Pocket Part). As of October 15, therefore, each member of plaintiff's class was entitled to an OASDI check reflecting a 20 per cent increase and an OAA check reflecting (a) an addition of the transportation and cost of living allowance increases and (b) a subtraction of the OASDI increase to the extent it exceeded $7.50.

Massachusetts coped with this massive, time-foreshortened, interacting computation task in the following manner. Between April and August it had been compiling a computer master file. On September 6 it decided to use its computer to make the changes, stemming from the new federal and state laws, because prior experience indicated that manual computation by social workers would require six months. In mid-September, state social workers received instructions and a "turnabout document" for each OAA recipient; two weeks later, most of the cards had been filled out by the workers and returned to Regional Data Control Units which checked and edited the cards. They were then delivered to Regional Data Processing Units to be transferred to magnetic tapes which were, finally, transferred to a Central Data Processing Unit, which, between October 7 and 11, computed the amount of the OAA grant for each recipient, the checks themselves being printed between October 12 and 14 for receipt on or about October 16.

In the meantime, on September 29, the notice, reproduced in the margin,[2] the adequacy of which is the issue in this case, was sent to plaintiff's class. While specifying the kinds of changes to be expected and indicating that the recipient would be receiving, from both his OASDI and OAA checks, more money than before, the notice gave no formulae, computations or amounts. And, while it advised the recipient of his right, if dis-

2. NOTICE:

The Social Security check which you will receive on October 3, 1972 will include a 20% increase in benefits. Under Massachusetts law, this increase must be considered in arriving at the amount of your Old Age Assistance grant from this Department.

Chapter 788 of the Acts of 1972 gives this Department authorization to disregard the first $7.50 of any income you may now be receiving and to increase the amount allowed for travel allowance by $5.00 monthly. In addition, there is a 3% cost of living increase in the amount allowed as a basic budget. In any event, you will have more money available for your own use after October 15, 1972 than you did in September 1972.

As a result of all these changes, the assistance check you will receive on October 15, 1972 may be increased, decreased or your grant may be terminated.

If you are dissatisfied with the amount of your check of October 15, 1972 you may call your Social Worker for a more detailed explanation. If your grant is decreased or terminated, you also have the right to appeal this reduction or termination, and blanks for this purpose will be supplied by your Welfare Office upon your request. If you wish to appeal for a hearing or review, you must file your request no later than December 14, 1972.

satisfied with the first adjusted check, to consult a social worker and to appeal for a hearing on any OAA decrease or termination, such would obviously occur after such actions had taken place. These—the lack of precise computations and the lack of opportunity for a hearing in cases involving factual disputes prior to changing OAA checks—are the two deficiencies which plaintiff alleges constitute a violation both of due process and of the applicable regulations, both federal, 45 C.F.R. § 205.10(a)(5), and state, Massachusetts Public Assistance Policy Manual, Ch. II, Sec. A, par. d.

The district court, on the basis of a stipulation, some testimony, and affidavits, dismissed the complaint. The key to its holding was its finding "that, if we consider the total amount received by any one of the plaintiffs in the case at bar from both OAA grants and OASDI benefits in combination, he has not suffered, and is not threatened with, any discrimination, but, on the contrary, he has an increase in his individual receipts." Velazco v. Minter, 352 F.Supp. 1109, 1116 (D.Mass.1973).[3] The court accordingly ruled: "It is sufficient to hold that when the total bundle of OAA and OASDI payments to an individual is increased neither the Constitution nor any of the statutes nor regulations nor manuals cited requires that the governing authorities give him *in advance* a

detailed or other notice or a hearing of any kind." *Id.* at 1117 (original emphasis). We affirm, but on the basis of a somewhat different approach. We conclude that at least 45 C.F.R. § 205.-10(a)(5) requires an advance notice, but that the notice given did, under these unusual circumstances, satisfy that regulation and due process requirements.

 The constitutional challenge is, in the present narrow context, perhaps more easily answered. We begin with the recognition that we must weigh and balance the recipients' and the state's interests in determining the extent to which procedural due process must be afforded the recipient. Goldberg v. Kelly, 397 U.S. 254, 262–263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Initially we note that neither *Goldberg* nor its companion case dealing with the termination of old age benefits, Wheeler v. Montgomery, 397 U.S. 280, 90 S.Ct. 1026, 25 L.Ed.2d 307 (1970) (Wheeler I), struck the balance for the case before us. Those cases dealt only with the procedural due process required when a state "*terminates* public assistance payments to a *particular recipient.*" *Goldberg, supra,* 397 U.S. at 255, 90 S.Ct. at 1014 (emphasis added). *See* Daniel v. Goliday, 398 U.S. 73, 90 S.Ct. 1722, 26 L.Ed.2d 57 (1970). Nor is our decision governed by the many cases holding that *Goldberg* applies to individual reductions as well as terminations of aid.[4] Similar-

3. Plaintiff, assuming that the court's decision was a judgment on either defendant's motion to dismiss or defendant's motion for summary judgment, points to two of thirteen affidavits submitted with plaintiff's motion for summary judgment, though not offered as evidence at the hearing, which are inconsistent with this finding. Only one of these seems clearly to allege a reduction in total assistance. Notwithstanding, in view of the study made at the court's suggestion of 26 random recipients and the live testimony received, at what the record clearly indicates was a hearing encompassing plaintiff's requests for permanent injunctive and declaratory relief, we interpret the court as making a finding based on the evidence before it and a ruling on the merits.

4. *See, e. g.,* Lage v. Downing, 314 F.Supp. 903 (S.D.Iowa 1970); Merriweather v. Burson, 325 F.Supp. 709 (N.D.Ga.1970), *remanded* for evidentiary hearing on point in light of *Daniel, supra,* 439 F.2d 1092 (5th Cir. 1971); Hunt v. Edmunds, 328 F.Supp. 468 (D.Minn.1971); Smith v. Graham, 1 Pov.L.Rptr. ¶ 1715 (D.Kan. Jan. 5, 1971); Yee-Litt v. Richardson, 353 F.Supp. 996 (N.D.Cal. Jan. 17, 1973) (preliminary injunction against state regulations denying pre-termination or reduction hearings in cases involving only issues of policy found to have been erroneously applied to cases involving individual questions of fact or judgment), aff'd, —— U.S. ——, 93 S.Ct. 2753, 37 L.Ed.2d 152 (June 4, 1973); Elliot v. Richardson, 41 U.S.L.W. 2554 (D.Hawaii Apr. 3, 1973).

ly, we need not consider the cases concerning the application of *Goldberg* to across-the-board reductions mandated by changes in state law or policy.[5] Rather we have the extremely narrow and unusual situation of a reduction in OAA benefits mandated by federal and state law as a result of an increase in the amount of other public benefits, in this case old age insurance benefits, producing in each case a net increase in total benefits.[6] In these circumstances, we believe the slight risk of loss to members of plaintiff's class is so heavily outweighed by the burdens and risks to the state's legitimate interests that the pre-reduction procedures employed here are constitutionally adequate.

We are not faced here with a recipient "condemned to suffer grievous loss", a deprivation of "the very means by which to live", *Goldberg, supra,* 397 U.S. at 263, 264, 90 S.Ct. at 1018, or even a significant reduction of those means. Even apart from the court's finding that none of the plaintiff's class suffered even a temporary net diminution in benefits, the worst fate that could have befallen a recipient would have been a short-term deprivation based on human and/or computer error. The recipient would then have been essentially in no worse a position than if there had been a mistake, human or mechanical, in sending out his regular check. Moreover, the advance notice here, not of course given when regular checks suffer from computer or other error, provided adequate protection against that contingency. It informed the recipient that the total new OAA and OASDI checks would make "more money available for your own use after October 15, 1972 than you [had] in September 1972." If the first checks did not bear out this prediction, the recipient would be on notice of an error, though not of its exact scope, and thus capable of initiating prompt action to rectify it.

We recognize that recipients receiving a net increase would not have been made aware of, and hence would not have had any reason to inquire into, any discrepancy between the increase they received and the increase to which they were entitled. Such an insufficient increase would obviously be prejudicial. It would entail some deprivation of the means by which the recipient lives, OAA benefits being calculated by need, here properly redefined to account for recent increases in costs of living. Yet it would not be a net worsening of the recipient's available resources. Moreover, there was no evidence that anyone in plaintiff's class suffered even this form of short-changing.[7] But even were we to accept the plaintiff's assumption that the risk

---

5. Most courts have held that some or all of the *Goldberg* requirements are inapplicable in such situations. *Merriweather, supra;* Provost v. Betit, 326 F.Supp. 920 (D.Vt.1971); Rochester v. Ingram, 337 F.Supp. 350 (D.Del.1972); Smith v. Graham, *supra;* Freeman v. Engelman, 2 Pov.L.Rptr. ¶ 15,104 (D.N.J. Sept. 16, 1971); State ex rel. Ellis v. Heim, 83 N.M. 103, 488 P.2d 1207 (1971). *But see* Wheeler v. Montgomery, 1 Pov.L. Rptr. ¶ 1705 (N.D.Cal. Oct. 29, 1971) (*Wheeler II*); Yee-Litt, *supra.*

6. Our research reveals only two other cases in which a welfare reduction was challenged when coupled with a concomitant increase in another public program benefit. Simmons v. Parham, 1 Pov.L.Rptr. ¶ 1705 (N.D.Ga. Sept. 24, 1971); Almenares v. Lavine, 2 Pov.L. Rptr. ¶ 16,190 (S.D.N.Y. Oct. 10, 1972). In both cases the reduction procedures were challenged as inadequate only under the applicable federal regulation, *see discussion infra,* and in both the decrease in one benefit was apparently exactly the same as the increase in the other.

7. The evidence before the district court included an affidavit by defendant's computer program consultant which states that some 2000 AFDC recipients received improperly reduced checks on October 15 and that supplemental corrective checks were sent to those persons on November 1. The affidavit states only that "Effect of improper reduction was equivalent to 3.6% of OASDI." This would suggest, though there is no direct statement to this effect, that these recipients, not members of plaintiff's class, did not suffer a net reduction of benefits but only the type of less-than-proper net increase discussed in text.

of such errors is substantial, we must balance it against the predicament in which the Commonwealth found itself. Had it continued OAA checks at the old level for another month until notices detailing the computations and final amounts could be sent, it would not only have distributed several hundred thousand dollars of benefits beyond recipients' entitlement, but might possibly have forfeited federal matching funds in the same amount.[8] Massachusetts might then have had to lower OAA benefits for all recipients at some later time in the fiscal year. For these reasons, we hold that the pre-reduction notice here provided was constitutionally adequate even though it did not give detailed computations of the specific effects of the state-wide changes on the individual recipient's benefits.[9]

What we have said regarding notice clearly indicates that we do not believe that pre-reduction evidentiary hearings are required in these circumstances. Without specific notice of the computations and result, one would not have a basis for claiming a factual dispute requiring a hearing. Moreover, even were the detailed notices sought by plaintiff provided, an evidentiary hearing in the *Goldberg* sense would obviously not be meaningful. There are no questions of credibility, no secret accusers, no personal bias. There is only the question of whether a mathematical formula was correctly applied to a particular amount. We cannot imagine why anything more than an opportunity for a personal meeting with a welfare official with the appropriate information and power to arrange for correction of any error would be necessary. Here because of the costs to the state—and perhaps ultimately all welfare recipients in the state—of delaying this reduction, offset by another program increase, until specific notice and such a meeting could be held, the absence of any showing of actual prejudice, the undefined risk of such prejudice, and the availability of post-reduction hearings and review, we do not believe that due process in this case required a pre-reduction hearing.[10]

8. On October 11, the day that the Massachusetts recalculations were completed and the day before the checks were printed, the acting regional commissioner of the federal Department of Health, Education and Welfare wrote defendant that "a disregard of the Social Security Increase would not only raise a conformity question, but would also present a matching question to the extent the assistance payments are attributable to the improperly disregarded income." While the wording of 45 C.F.R. § 205.10(b)(1), to which we are referred by plaintiff, insuring federal financial participation for "[p]ayments of assistance continued pending a hearing decision" could be read to cover the costs of unreduced benefits for the extra month delay that detailed notices would have imposed, we think that in light of the unavailability of pre-reduction hearings, *see infra*, and the HEW Memorandum of July 25, *see* n. 11 *infra*, defendant's reading of the regional commissioner's letter as threatening withholding of federal funds even for a single month's disregard of the increase to satisfy the notice requirement in detail is not unreasonable.

9. The only case holding that due process requires a specific pre-reduction notice

of the actual, individual effects of state-wide changes in the governing law is *Wheeler II, supra* n. 5. It is unclear, however, whether that case also involved questions of individual eligibility and/or factual questions regarding the application of new state law to individual cases. The prior history suggests that such questions were at least part of the case. Insofar as only computational applications were involved, the case is distinguishable since it dealt with net reductions, there being apparently no concomitant increase in another benefit program as here.

10. Plaintiff argues that under Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), even a temporary, nonfinal deprivation of a statutory entitlement is a deprivation of property under the Fourteenth Amendment requiring prior notice and hearing. *Id.* at 85, 92 S. Ct. 1983. As our discussion indicates, we recognize that due process applies to this situation. Yet as *Fuentes* repeatedly reaffirmed, the nature of the interests involved is relevant to the form of notice and hearing provided. *Id.* at 82, 84, 86, n. 21, 92 S.Ct. 1983. We are aware that the Court in stating the latter principle said "But *some* form of notice and hear-

These conclusions do not dispose of the case, for however sensible defendant's action was under the circumstances, we confront the fact that the requirement of "timely and adequate advance notice" of "any proposed action to . . . reduce assistance" under a relevant title of the Social Security Act (here Title I–OAA), 45 C.F.R. § 205.-10(a)(5), was clearly not fulfilled. The district court held that the advance notice requirement does not apply where total assistance is not reduced. We do not say this is unreasonable. But, since the OAA assistance covered by the regulation was clearly reduced, such reduction being counterbalanced by increases in a program not subject to the regulation, and since HEW interpreted its regulation to apply to this very circumstance,[11] we prefer to rest our decision on what we deem the sensible scope of the emergency interpretation.

The regulation, apart from its requirement of a 15 day advance notice—clearly met in this case—also specifies the content of that notice: (1) "details of reasons for the proposed agency action"; "explanation of" (2) "the individual's right to conference"; (3) "his right to request a fair hearing"; and (4) "the circumstances under which assistance is continued if a fair hearing is quested." § 205.10(a)(5)(i)(b). If the adequacy of notice in this case were measured by this regulation standing alone, we would find adequate only the description of reasons for action [12] (but not its description of the proposed action) and the circumstances under which assistance is continued.[13] We look at

ing—formal or informal—is required before deprivation of a property interest that 'cannot be characterized as *de minimis.*'" *Id.* at 90 n. 21, 92 S.Ct. at 1999. (Original emphasis.) The interest here might be labelled *de minimis.* Moreover, though the notice here only stated that "you may call your Social Worker for a more detailed explanation" *after* receiving the modified check, there is nothing to indicate that recipients could not have called and obtained an informal conference to explain the changes *before* the checks went out. Finally, we think this might be one of the "extraordinary situations" mentioned in *Fuentes* that justify postponing at least the opportunity for a hearing. *Id.* at 90–93, 92 S.Ct. 1983. There was "a special need for very prompt action", the changes were effected by government officials, and there existed the government interest of maintaining the appropriated state and matching federal funds for all program recipients which was probably important enough to justify postponement of the hearing though not the notice required by due process. *Id.* at 91, 92 S.Ct. 1983.

11. On July 25, 1972, HEW sent to all states Information Memorandum No. 73–3 explaining the implications of the recent Social Security increase for the state categorical assistance programs. Its discussion of the advance notice requirement began with the statement: "Compliance with the 15 day Advance Notice Requirement to recipients (Section 205.10(a)(5) . . . .) is necessary."

12. All of the factors prompting the recomputation—the Social Security increase, the state law requiring consideration of this increase in determining the OAA grant, the new state statute, cited by chapter, authorizing the $7.50 disregard and the $5.00 increase in travel allowance, and the 3% cost of living adjustment to the basic budget—were stated clearly and specifically. A recipient obtaining this information could compute, with a fairly high degree of accuracy, the individual impact the general implementation of these amendments would have. The only calculation not specifically mentioned is the addition of $.92, equal to 20% of the Medicare Part B premium, which is not reflected in the individual's OASDI payments. This factor, explicit description of which would only have confused the recipient making an effort to implement the information received, as it did us for some time, was, of course, encompassed within the general reference to the Social Security increase.

13. Sections 205.10(a)(5)(iii)(a)(1) and (2) provide that assistance need not be continued until the fair hearing if the state agency determines "that the issue is one of State agency policy and not one of fact or judgment relating to the individual case" and if the agency "promptly informs the claimant in writing if assistance will be discontinued based on the State agency's determination". Such a determination and communication are, we think, manifest, though not expressly articulated, in the September 29 notice. The

the HEW Memorandum, however, as either expressly or impliedly supplying enough "give" to the basic regulation in these extraordinary circumstances to save the remainder of the notice.

The description of "proposed agency action" would normally consist of specific information telling a recipient the amount by which his benefits were to be changed. The HEW Memorandum specifies this kind of action description as one of two alternatives. A second alternative, applicable "[i]n view of the difficulty [sic] some States may encounter in having sufficient time to compute the exact amount of change in each case for the 15 day Advance Notice Period", was to "develop a general letter advising [OAA and OASDI] recipients . . . that because of P.L. 92–336, the October 1972 assistance payment will reflect a reduction equal to the amount of the increased benefit (if this in fact will be the result after computation). This will satisfy the 15 day Advance Notice Regulation." Here the description of the action was more diffuse (OAA assistance "may be increased, decreased or . . . terminated"), being limited only by the sentence "In any event, you will have more money available for your own use . . . than you did" before. But we do not adopt an inclusio unius, exclusio alterius reading of the Memorandum, nor do we consider the Memorandum as a binding construction of the regulation. Here, because of the Commonwealth's generosity, the computations were far more involved than the simple trade-off computation deemed adequate justification for a general letter by the Memorandum, which cited only the time pressures. The complex, massive, re-calculations required in the shortened time lead us to accept the minimal description of individual impact offered here as an adequate statement of the "proposed agency action" required by the regulation.

The notice given of the recipient's right to conference did not explain, as the regulation arguably requires, that | there was a right to be represented by counsel in a discussion before action is taken at which an explanation would be obtained and an opportunity provided to present information showing the proposed action to be erroneous. The notice merely stated that "If you are dissatisfied with the amount of your check of October 15, 1972 you may call your Social Worker for a more detailed explanation." If a pre-reduction right to such a conference existed here, the notice would clearly have been inadequate. However, we do not believe that a pre-reduction right to conference existed here, for the simple reason that a meaningful conference would have been impossible. When the notices were sent on September 29, the social workers were just completing and returning the turnabout documents. The computer calculations based on these documents and other information were not completed until October 11. As far as we know, at no time before the checks were sent to the recipients did the social workers receive the final calculations, or even the conversion formulae used. Thus the social worker could have provided recipients with no further explanation of the action than that in the notice and could have made no use of any information provided or arguments made by the recipient or the accompanying representative. The most that could have been accomplished would have been an attempt to calculate the probable new benefits based on the recipient's last checks and the information in the notice, a calculation that the recipient or his or her attorney could as well have done, as noted *supra* n. 12.

The notice was similarly cryptic in its explanation of "the right to request a fair hearing". It spoke first only of

references to the various state laws and the general Social Security and cost of living increases describe not only an "agency policy", but a policy mandated by state and federal legislation. Claim-

ants were promptly informed of discontinuance by the statement that the October 15 check might reflect a decrease or termination of the OAA grant.

"the right to appeal" and later only of a "wish to appeal for a hearing or review". While the notice did not explicitly state there was a right to a hearing nor describe the exact procedure to be employed, § 205.10(a)(7)–(10), we find that under the circumstances the notice adequately informed the recipient of his or her ability to obtain a hearing with all the procedural implications that term carries.

We note that neither the shortness of time nor the complexity of the mathematical calculations prevented a clear and complete statement of the recipients' rights. Under normal circumstances, involving an individual adjustment, such shorthand summaries would not be adequate. However, here, where the proposed action is a general mathematical recalculation and the rights to a pre-reduction conference, fair hearing, and continued assistance are clearly inapplicable, we accept, grudgingly, this brief form of notice.[14]

Finally, plaintiff claims that the notice provided was inadequate under state regulations. Clearly, if Chapter II, Sec. A, par. d, Massachusetts Public Assistance Policy Manual, applied to this situation, the notice was inadequate, the regulation requiring that the notice explicitly state the right to personally appear at the welfare office within 15 days to review the matter with an impartial staff member, set a specific appointment but inform the recipient of the opportunity to change it if inconven-

ient, and explain the right to be accompanied by another, including an attorney, to introduce evidence, and in appropriate cases to cross-examine. We have been pointed to no state administrative or judicial interpretation of this provision. While the end of par. d states that "the procedures outlined above shall also apply when a determination has been made which will result in a reduction of the regular monthly assistance payment", the wording of that and the surrounding regulations seems to us to indicate that it does not apply to a state-wide reduction based on mathematical computations as here. Paragraph c provides that "when a WSO [Welfare Service Office] obtains information which indicates that a change in the individual's circumstances may affect the amount of assistance to which he is entitled or may make him ineligible", eligibility must be reconsidered within 30 days. Paragraph d states that "The recipient must be given at least fifteen days advance notice of questions (e. g., hearsay evidence) the WSO has about an individual's eligibility." Cases when cross-examination are allowed are those "where veracity or testimony is in dispute". Similar language is found in paragraph e relating to the appeal procedures after the hearing. The wording of these regulations suggests to us that they only apply to cases where specific factual information relating to an individual's eligibility or entitlement is involved.

---

14. Although like the court in Simmons v. Parham, *supra*, n. 6, we accept HEW's suggestion that a general description of agency action is adequate when time and the need to recalculate welfare benefits in light of Social Security increases preclude more specific notice, we need not decide whether the even less complete notice of proposed action, details, and rights given there would be sufficient under these circumstances.

We recognize that the court in Almenares v. Lavine, *supra*, dealing with New York's efforts during the very same changeover period, ordered welfare benefits to be continued until a precise notice of the specific effect of the changes on individual benefits and the individual's rights could be sent to recipients. In that case, however, not only was the HEW Information Memorandum of July 25 apparently not relied upon by the state, but there had been a prior court order on April 22 specifically addressing notice, which order had been violated. We do not feel compelled to follow *Almenares*, deeming the court's strict application of the regulation to be responsive to a particular history not present here.

The notice here satisfying due process and the federal regulation, and the state regulation being inapplicable, the judgment is

Affirmed.