LOCAL 32, OFFICE AND PROFESSIONAL EMPLOYEES IN-
TERNATIONAL UNION, AFL-CIO, AN UNINCORPO-
RATED ASSOCIATION, PLAINTIFF, v. MARLENE SABE-
TAY, DEFENDANT.

LOCAL 32, OFFICE AND PROFESSIONAL EMPLOYEES IN-
TERNATIONAL UNION, AFL-CIO, AN UNINCORPO-
RATED ASSOCIATION, PLAINTIFF, v. ELIZABETH WAL-
TON, DEFENDANT.

District Court Morris County

April 17, 1978.

*Mr. Myron D. Milch* for plaintiff (*Messrs. Weitzman, Brady and Weitzman,* attorneys).

*Mr. Thomas W. Greelish* for defendants (*Messrs. Schenck, Price, Smith and King,* attorneys).

MACKENZIE, J. C. C. (temporarily assigned). This is an action brought by a labor union against two of its members to enforce and collect disciplinary penalties previously imposed by the trial board of the union for violations of the union constitution and by-laws. These two defendants resist payment of the fines, urging that their rights as union members were so grossly violated as to require the court to invalidate the sanctions imposed by the union.

The facts are not seriously in dispute. At a general membership meeting in June 1975 the rank and file of Local 32, Office and Professional Employees International Union, AFL-CIO (Local 32), following the recommendation of its leadership, voted to strike against Hospital Service Plan of New Jersey (hereafter Blue Cross) and Medical Service Plan of New Jersey (hereafter Blue Shield).[1] Defendants, as dues paying members of Local 32 in good standing, were employed at that time by Blue Cross/Blue Shield at the Morristown office. They were present at the meeting when

---

[1] Legality of the strike vote and strike call is not an issue. Defendants concede that Local 32 complied with the procedural requirements of the union constitution.

the strike vote was taken. They heard the business agent of the union instruct the membership that picket lines were to be set up at Blue Cross/Blue Shield offices throughout the State. The membership was forbidden either to cross the picket lines or to perform useful work for the employers. The business agent warned that fines, suspensions or expulsion could be the result should any member violate his instructions. Specific reference was made to Art. 15, § 2 of the union constitution, which provides:

Any member may be penalized for committing any one or more of the following offenses:
(a) * * *
(b) Working for an employer against whom the union has declared a strike * * * unless permission has been granted by the proper officers of the union.

A member is subject to a fine of $25 for each separate violation of the by-laws. However, no written instructions respecting conduct during the strike were given to the membership.

On July 7, 1975 Mrs. Walton walked through the picket line set up in front of the Morristown Blue Cross/Blue Shield office at 24 Washington Street and entered the building. Mrs. Sabetay did the same on July 8, 1975. Cocaptains of the strike team who were on picket duty observed Mrs. Walton and Mrs. Sabetay enter the office but could not determine what either did, if anything, while inside. By separate letters, each dated July 8, 1975, the cocaptains wrote to the secretary-treasurer of Local 32 charging these defendants with having "crossed the picket line [on July 7, 1975 in the case of Mrs. Walton and on July 8, 1975 as to Mrs. Sabetay] to perform work for New Jersey Blue Cross and New Jersey Blue Shield at 24 Washington Street, Morristown, New Jersey 07960, during a strike." The co-captains requested the executive board of the union to hold a hearing as to these charges. The letters were timely received at Local 32's business office. No other charges

against these defendants were made to the secretary-treasurer in writing by the cocaptains or by anyone else.

The union constitution sets up an internal procedure to be followed in case of violation of union rules. Any member of the local may complain about the conduct of another member by filing a written statement of charges with the secretary-treasurer of the union. Immediately upon receiving the complaint the secretary-treasurer is required to serve a copy of the charge upon the accused and to notify the member of the time and place of the hearing before the executive board of the local union. The member is entitled to be represented by counsel or by another union member at the hearing.

The notice of charges was sent to Mrs. Sabetay by certified mail on October 9, 1975. She received the letter on October 16, 1975. The letter informed her that "you are hereby directed and required to appear before a trial board of this local union on October 15, 1975, at 6:00 p.m. in the Robert Treat Hotel, 15 Park Place, Newark, N. J." The letter also warned that the hearing would proceed even in the absence of the accused "upon proof that sufficient notice of the time and place set for the trial was given to the defendant." A copy of the accusatory letter of July 8, 1975 was enclosed. Why the secretary-treasurer waited for three months before sending the required notices to these two union members was not established. No prior notice — writen or oral, formal or informal — was given to either defendant by the union.

Mrs. Walton was mailed a letter which was identical in form to the letter sent to Mrs. Sabetay, with the exception that the time set for her trial was 5 p.m. There was no proof when this letter dated October 10, 1975 was received by Mrs. Walton. The letters were the first notice in writing from Local 32 to either defendant that charges had been filed against them. They were the first and only notice of the trial dates. Neither lady appeared on October 15, 1975 before the trial board. Nonetheless, the charges against both

of them were heard on that date. Mrs. Sabetay was found to have crossed the picket line and performed useful work for the employer on 40 successive working days from July 5, 1975 until the end of the strike in early September. Mrs. Walton was found to have committed the same violations on 39 successive working days beginning on July 6, 1975. The general union membership approved the actions of the trial board at its meeting of November 20, 1975.

By letter of November 25, 1975, the secretary-treasurer informed Mrs. Walton that she had been found guilty of violations of the local constitution and by-laws. She was informed that a fine had been assessed against her in the amount of $25 for each of 40 violations. The total fine assessed was $1,000. A similar letter was sent to Mrs. Sabetay on the same date, the only difference being that her total fine was $975. Both women exhausted their union remedies by appealing unsuccessfully to the International Brotherhood. Neither defendant has paid her respective fine despite repeated requests by the union. Suit was instituted against each defendant for collection of the fines. Because of the existence of common issues of law and fact, the court on its own motion consolidated the two complaints. *R.* 6:5–2(c).

The first issue is one of jurisdiction. In *NLRB v. Allis-Chalmers Mfg. Co.,* 388 *U. S.* 175, 87 *S. Ct.* 2001, 18 *L. Ed* 2d 1123 (1967), reh. den. 389 *U. S.* 892, 88 *S. Ct.* 13, 19 *L. Ed.* 2d 202 (1967), the United States Supreme Court upheld the right of a union to impose a fine upon one of its members for crossing a picket line. The court stated that a union has the power

* * * to protect against the erosion of its status under [federal labor] policy through reasonable discipline of members who violate rules and regulations governing membership. That power is particularly vital when the members engage in strikes. The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and "[t]he power to fine or expel strikebreakers is essential if the union is to be an effective

bargaining agent * * *." Provisions in the union constitutions and by-laws for fines and expulsion of recalcitrants, including strike-breakers, are therefore commonplace and were commonplace at the time of the Taft-Hartley amendments.

In addition, the judicial view current at the time § 8(b)(1)(A) was passed was that provisions defining punishable conduct and the procedures for trial and appeal constituted part of the contract between member and union and that "The court's role is but to enforce the contract." [at 181–182, 87 *S. Ct.* 2007; footnotes omitted]

New Jersey decisional authority follows the *Allis-Chalmers* case. In *North Jersey Newspaper Guild v. Rakos*, 110 *N. J. Super.* 77 (App. Div. 1970), certif. den. 56 *N. J.* 478, the court set forth the following as a general proposition:

It would appear clear that, in general, a labor union may discipline one of its members for violations of its rules; that such discipline may take the form of a fine, and that such fine, when reasonable and levied in accordance with due process, may be collected in an action at law in the state courts. [at 82; citations omitted]

*Rakos* also defined the relationship between the union and the membership as follows:

The relationship between a local and its members has been held to be a contractual one. The "contract" consists of the union's constitution and such rules, directions or regulations as may be adopted by the local union consistent therewith or pursuant thereto. A union may fine or expel a member to enforce compliance with its constitution or rules. *NLRB v. Allis-Chalmers Mfg. Co., supra.* Defendant by his acceptance of membership in the Guild, consented to be bound by its rules and subject to its discipline * * * So long as he remained a member of the union such obligations were binding upon him and he could be held to answer to his fellow employees for their violation [at 86–87]

In this case both defendants pledged in their applications for membership to faithfully comply with the Local 32 constitution and the by-laws, and all amendments. In addition, both defendants were present when the strike vote was taken, when the instructions as to the conduct of union members during the strike were given, and when the warnings about noncompliance were given. These de-

fendants were therefore clearly under an ongoing contractual relationship with the union at all times relevant hereto. Just as defendant in *Rakos* consented to be bound by its rules and subject to its discipline by his acceptance of membership into the Newspaper Guild, these defendants by their acceptance of membership in Local 32 and by their attendance at the strike-vote meeting consented to be bound by the union rules and by all instructions and regulations presented to them. This court thereby has jurisdiction.

■ The second issue is the sufficiency of proof against defendants at the trial board hearing. *International Brotherhood v. Hardeman*, 401 *U. S.* 233, 91 *S. Ct.* 609, 28 *L. Ed.* 2d 10 (1971), reh. den. 402 *U. S.* 967, 91 *S. Ct.* 1607, 29 *L. Ed.* 2d 132 (1971), sets forth the proper standard of judicial review of union-imposed discipline. Simply put, the court held (at 246, 91 *S. Ct.* at 617) that the guarantee of a full and fair disciplinary hearing "requires the charging party to provide some evidence at the disciplinary hearing to support the charges made." A stricter standard is inconsistent with the apparent congressional intent to allow unions to govern their own affairs and would require courts to judge the credibility of witnesses on the basis of what would be at best a cold record. In *Kiepura v. Local Union 1091*, 358 *F. Supp.* 987 (N. D. Ill. 1973), the court, in construing the *Hardeman* decision, found that it was not empowered to inquire into the merits of the charge brought against the union member as long as the member received a full and fair hearing on those charges. *Hardeman* and *Kiepura* clearly set the limits of a reviewing court's inquiry. Based on these parameters, suffice it to say that there was at least some evidence at the disciplinary hearing to support the charges made against these defendants. The probative value of that evidence is not of concern here. It is the threshold sufficiency of the evidence, and no more, that this court may properly review.

■ The third issue is that of sufficiency and timeliness of notice to defendants of the disciplinary hearing. In each

complaint it is alleged that such notice was given along with notice of the charges against each defendant. Both defendants have claimed that the inadequate and untimely notice from Local 32 deprived them of procedural due process of law.

Notice of the extent of charges against each defendant was not given in accordance with the requirements of the union constitution. The secretary-treasurer did not "immediately" serve a copy of the charges lodged against the defendants in the first week of July 1975. The charges were not mailed to defendants until the second week of October 1975. The word "immediately" must be defined as substantially less than three months.

Further, the notice failed to be meaningful. The notice to Mrs. Sabetay was mailed October 9, 1975 but was not received until one day after the "hearing" had been conducted. The notice to Mrs. Walton was mailed on October 10, 1975. It is not known when she received her notice. A notice of disciplinary hearing which is received after the hearing has been held is no notice at all.

Additionally, there are substantive deficiencies in the notices. Neither notice mentions each defendant's right under the union constitution to have an attorney represent her. Nor does either notice mention the right of any accused member to be represented by any other member of Local 32.

More importantly, neither notice specifies with particularity the nature and extent of the charges that each defendant would be called upon to answer. Instead of specifying that each woman was charged with 40 and 39 violations, respectively, each notice appears to be a general form letter to which was attached the July 8 letter from the strike co-captains. It would be entirely reasonable for either of defendants, having received this general form of notice, to conclude that she was being charged with only one act of union misconduct. Each could then reasonably conclude that she was only potentially subject to a maximum fine of $25. In no way could any reasonable person conclude by the notice

that was given in this case that she would be called upon to answer charges of 39 or 40 violations. The union prosecuted both defendants *in absentia* for 39 and 40 separate violations respectively and then fined them $25 for each violation.

To define and protect the rights of union members Congress has enacted a "bill of rights" for members of labor organizations 29 *U. S. C. A.* § 411 *et seq.*[2] 29 *U. S. C. A.* § 411(a)(5) provides as follows:

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

A remedy in the United States District Court is available to enforce these rights. 29 *U. S. C. A.* § 412. No reason why these rights are not available to these defendants in this state court action has been suggested.

For reasons already set forth, not only did the union violate the provisions of its own constitution and by-laws, but it clearly failed to afford federally protected rights to these defendants. Defendants were not advised in writing that they stood charged with 39 and 40 violations respectively. They were not afforded time to prepare a defense. They were not afforded a full and fair hearing. The fines cannot withstand judicial scrutiny.

Factually inapposite, but enlightening, New Jersey cases are consistent with the conclusion that these defendants' federally-guaranteed rights were violated. In *In Re Delaney,* 144 *N. J. Super.* 483 (App. Div. 1976), the issue was revocation of plaintiff's firearms identification card. It is recognized that a different statute and standard were involved in the *Delaney* case. Nonetheless, in determining that the

---

[2] *Pub. L.* 86–257, *Title* I, § 101 (1959).

revocation had been accomplished by police authorities improperly, the court said:

The petition filed in this case never referred in any way to revocation of a firearms purchaser identification card. It merely stated that plaintiff had "five gun permits" and recited that the chief of police wished to revoke "five permits issued by me to you for possession of five guns." Considering that the only guns which had been confiscated were handguns, plaintiff had no reason to believe that the petition would affect his identification card. We therefore hold invalid for lack of proper notice that portion of the judgment which revoked the card. [at 488]

In *In re Suspension of Heller*, 73 *N. J.* 292 (1977), the issue involved was the assessment of civil penalties by the New Jersey State Board of Pharmacy against a licensed pharmacist. The Supreme Court reversed the imposition of the civil penalty. The reason for the reversal as to the civil penalty was clearly set forth:

The only provisions of the Pharmacy Act which deal with the imposition of monetary penalties are found in *N. J. S. A.* 45:14-37 and -38. Section 37 provides that any person who violates the act shall pay a "penalty" of from $25 to $50 for the first offense, from $50 to $100 for the second offense, and not less than $100 for each subsequent offense. Section 38 then provides in pertinent part:
"(a) Any penalty imposed because of the violation of any provision of this chapter shall be collected and enforced by summary proceedings pursuant to the Penalty Enforcement Law (*N. J. S.* 2A:58-1 *et seq.*). Process shall issue at suit of the board, as plaintiff, and shall be either in the nature of a summons or a warrant."
In the present case it is obvious that the Board failed to follow the procedure prescribed by the statute in imposing this penalty, and failed as well to afford Heller notice, in the complaint or otherwise, that it intended to consider such a penalty. Moreover, the Board made no attempt to follow the statutory schedule and impose separate penalties for each offense, but instead assessed the penalty based upon its own estimate of "the minimum amount of unjust profit" allegedly derived by Heller. For this there was no statutory warrant. Thus we need not pause to consider the propriety *vel non* of separate assessments, had they been made, on these multiple offenses. *Kingsley v. Wes Outdoor Advertising Co.*, 55 *N. J.* 336, 340 (1970), supplemented 59 *N. J.* 182, 189 (1971).

It is enough to repeat the language of the dissenting opinion in the Appellate Division:

"This [the imposition of a civil penalty] was done without any notice to the licensee that a monetary penalty was contemplated. The complaint alleging unprofessional conduct sought no such relief nor was any mention of any intention to assess a penalty made during the proceedings before the Board. Under these circumstances the licensee could not reasonably have been expected to have anticipated the imposition of a monetary penalty. He was thus deprived of an opportunity to present evidence in mitigation or bearing on his ability to pay." [150 *N. J. Super.* at 30].

In this posture the lack of procedural due process is conclusive. [at 309–310]

The court recognizes that the *Heller* case dealt with a state agency and that a union is involved here. .

*Fuentes v. Shevin,* 407 *U. S.* 67, 92 *S. Ct.* 1983, 32 *L. Ed.* 2d 556 (1972), reh. den. 409 *U. S.* 902, 93 *S. Ct.* 177, 34 *L. Ed.* 2d 165 (1972), was a replevin action in which no prior notice was given to the party whose property was replevied. Mr. Justice Stewart summarized:

For more than a century the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." [at 80, 92 *S. Ct.* at 1994]

The *Heller* court noted this very language from *Fuentes* as a crucial statement of the constitutional dimensions of procedural due process. The *Heller* court went even further in this regard:

The viability of such requirement [of notice] in circumstances such as the present case was well described by the court in *Department of Revenue v. Jamb Discount,* 13 *Ill. App.* 3d 430, 301 *N. E.* 2d 23, 27 (Ct. App. 1973):

"Procedural due process requires that notice be given of the claim asserted. The right to a hearing includes not only the right to present evidence but also a reasonable opportunity to know what claims must be defended against and what consequences are proposed * * * In order to be effectual, notice should be so full and clear as to disclose to persons of ordinary intelligence what is proposed * * * The test is whether the defendant should have

anticipated the effects and orders possible." [73 *N. J.* at 310–311; citations omitted]

Thus, in the context of current judicial thought it is undeniable that defendants were denied due process of law by Local 32. The reasons for this inescapable conclusion were sufficiently set forth earlier in this discourse.

For all the foregoing reasons, the disciplinary action taken against these defendants by the union is considered null and void and of no force or effect.[3] Consequently, the penalties that were imposed are not the proper subject of an enforcement action. The complaint is dismissed without costs.

---

[3]Nothing herein should necessarily be construed as barring Local 32 from again bringing charges against these union members for one or more violations of the by-laws or constitution.