**FARMERS DEPOSIT BANK, Appellant,**

v.

**Elmer and Betty RIPATO, d/b/a Rip's Ag Center No. 1, Rip's Ag Center No. 2, Harry C. Campbell, Trustee, and Attorney General of the Commonwealth of Kentucky, Appellees.**

**Elmer RIPATO, Betty Ripato, and Harry C. Campbell, Trustee for the Estate of Elmer B. Ripato and Betty L. Ripato, d/b/a Rip's Ag Center No. 1 and Rip's Ag Center No. 2, Cross–Appellants,**

v.

**FARMERS DEPOSIT BANK and Attorney General of the Commonwealth of Kentucky, Cross–Appellees,**

Nos. 86–SC–946–TG, 87–SC–954–TG.

Supreme Court of Kentucky.

Oct. 6, 1988.

As Modified on Denial of Rehearing
Dec. 15, 1988.

Stephen L. Barker, Tracey N. Bosomworth, Sturgill, Turner & Truitt, Lexington, David O. Welch, Welch, McDermott & Purdom, Ashland, for appellant and cross-appellee Farmers Deposit Bank.

Howell W. Vincent, Vincent & Willenborg, Howell W. Vincent, Vincent, Alig & Sheehan, Covington, for appellees and cross-appellants Elmer and Betty Ripato, etc.

John S. Sowards, Lexington, for appellee and cross-appellant Harry C. Campbell, Trustee, etc.

Frederic Cowan, Atty. Gen., Frankfort, James Ringo, Asst. Atty. Gen., for Com. of Ky.

STEPHENS, Chief Justice.

On April 28, 1981, Elmer and Betty Ripato executed two notes, one for $195,000 and another for $13,500, payable to Farmers Deposit Bank (Farmers). These notes were to cover the refinancing of the Ripatos' farm supply business, "Rip's Ag Center." Farmers had agreed to advance a total of $55,000 for business expenses, the $13,500

note representing only the first drawdown. The notes were secured by the inventory of the business, proceeds thereof, the business real estate, certain vehicles, and the Ripatos' residence, which covered over six and one-half acres. On June 30, 1981, $30,-000 was advanced to the Ripatos as a further drawdown on the agreed $55,000, and the remaining $11,500 was advanced on November 19. Business was booming for the Ripatos' Ag Center, so they borrowed another $100,000 from Farmers to open a second store, Rip's Ag Center No. 2." In addition to the foregoing loans, Farmers issued two letters of credit to Cotter & Company, the Ripatos' primary supplier of hardware-related items, for $30,000 and $60,000.

A dispute arose as to what, if any, payments were due on the principals of the notes, and so on October 18, 1982, Farmers moved for an Ex Parte Writ of Possession. The Lewis Circuit Court granted the motion, and the two Ag Centers were placed under bank control and operation. Furthermore, the funds of the Ripatos which were held by Farmers were set off against the debt of over $330,000 claimed by the bank. No notice, either written or oral, was given to the Ripatos that these funds would be set off at the time the deposits were made or thereafter, and the deposits were made in good faith with checks written against those funds under the expectation that they would be available. Neither did the Ripatos have notice of the ex parte writ which lost them their store prior to its service on October 21. A hearing was conducted on October 22, in response to the Ripatos' motion to quash the writ of possession. The hearing was suspended, however, in order that the parties might negotiate a mutually satisfying compromise. On November 1, 1982, the Lewis Circuit Court entered an agreed order signed by the judge which provided:

1. the Farmers Deposit Bank was to have one of its employees as a supervisor at each store to deposit the day's receipts,

2. from October 26, 1982 to January 1, 1983, Farmers would receive 35% of gross sales to apply to the loans,

3. Elmer and Betty Ripato were to grant Charles W. Rolph complete power of attorney to liquidate their assets within their best interests,

4. for the next 60 days, all purchases over $1000 must be approved by Rolph,

5. all checks written by the Ripatos after October 25, 1982 are to be cosigned by Farmers,

6. this agreement is a compromise and covenant not to sue,

7. the letter of credit to Cotter & Co. is not to be used, and they are to be paid with the Ripatos 65% of the sales,

8. the writ of possession and the pledged securities are released,

9. the bank shall not offset from the Ripatos account without due notice and a court order,

10. Farmers shall honor all outstanding checks by reason of the offsets during the week of October 18, 1982, to be paid from the Ripatos 65%, and

11. the gross proceeds of each day are to be divided—35% to Farmers, 65% to Ripatos.

On October 26, before the order had been entered, yet after the contract had been signed, the Ripatos discharged Rolph as counsel. They filed a "pro se" motion on November 4, 1982 to set aside the order. The Lewis Circuit Court granted their motion and set aside the order because it was drafted with the advice and counsel of one who did not represent the Ripatos' interests, and that the ex parte writ of possession, pursuant to KRS 425.076, was unconstitutional. At trial, the jury found for the Ripatos in the amount of $995,000, including $315,000 for punitive damages.

Both the Ripatos and the Farmers Deposit Bank appealed. We granted both as transfers from the Court of Appeals.

■ Farmers first argues that the covenant not to sue in the order of November 1, 1982 effectively bars the Ripatos from proceeding against them. Farmers maintains the order was agreed upon and binding. The Ripatos, however, contend that they never agreed to the terms thereof, it was entered as a result of a mutual mistake,

and they gave neither express nor implied authorization to Charles Rolph to bargain for them, or to agree to any compromise.

We disagree. The order was drafted with the active participation of representatives from both parties involved. The Ripatos did not discharge their attorney until after the compromise had been reached. They then claimed Rolph was without authority to speak for them. When the bargaining took place, Rolph represented the Ripatos' interests, and there was no reason for anyone to doubt his authority. The private contract was settled before any changes in counsel were made.

Even more significant, is the fact that the Ripatos abided by the very order they claimed to disown. The order provided, in general, that the Ripatos would maintain possession of their stores, yet allow for 35% of their gross sales to be used to pay off the debt to Farmers. Since the Ripatos did open for business, and thus complied with the terms of the agreed order which were favorable to them, they cannot now attempt to avoid their other contractual responsibilities. See *Bailey v. Runyan*, Ky., 293 S.W.2d 631, 633 (1956). In *Bailey*, the appellants entered into an agreed order but sought to accept the benefits while avoiding the less attractive clauses. As in all compromises, one must accept the bitter with the sweet. Farmers agreed not to foreclose on the Ripatos' home and business, in exchange for being allowed to maintain a watchful eye on the receipts, and a steady repayment of the debt from 35% of the Ripatos' gross sales. The Ripatos, on the other hand, agreed to split their receipts and be guided financially, in exchange for staying in their home and staying in business. Each side gave something and received something in return. Such is the nature of the true compromise. The desired result of a compromise of this kind is the avoidance of a lawsuit. Paragraph six of the agreed order specified quite clearly that, in order to fully receive all the benefits of the bargain, neither party would be allowed to sue the other.

Thus, the trial court should have granted a directed verdict in favor of Farmers on the issue of whether there was a binding agreement, and this agreement foreclosed any action the Ripatos may have had against the bank. We therefore reverse the decision of the Lewis Circuit Court and hold that there was a breach of a valid covenant not to sue when the Ripatos filed against Farmers.

Farmers next alleges that the trial court erred when it found KRS 425.076 to be unconstitutional. KRS 425.076 provides:

425.076. **Issuance of ex parte writ of possession.**—(1) A judicial officer, except as otherwise provided by statute, shall not issue an ex parte writ of possession unless it appears from facts shown by affidavit that great or irreparable injury would result to the plaintiff if issuance of the writ were delayed until the matter could be heard on notice.

(2) The requirement of subsection (1) is satisfied if any of the following are known:

(a) A danger that the property sought to be attached would be concealed or placed beyond the process of the court or substantially impaired in value if issuance of the order were delayed until the matter could be heard on notice.

(b) The defendant gained possession of the property by wrongfully taking the property from plaintiff. This provision shall not apply when the defendant has fraudulently appropriated property entrusted to him or obtained possession by false pretense or by embezzlement.

(c) The property is a credit card.

(d) Any other circumstances showing that great or or irreparable injury would result to the plaintiff if issuance of the writ were delayed until the matter could be heard on notice.

(3) The plaintiff's motion for the writ shall satisfy the requirements of KRS 425.011 and in addition shall include a showing that the conditions required by this section exist. The judicial officer may issue a writ of possession if he finds that the conditions required by this section exist and the requirements of KRS 425.036 are met. Where a writ of possession has been issued pursuant to this

section, a copy of the summons and complaint, a copy of the motion for the writ of possession and any affidavit in support thereof shall be served upon persons required by KRS 425.096 to be served with a writ of possession.

The Lewis Circuit Court found KRS 425.-076, the ex parte writ of possession statute, to be an unconstitutional infringement of the Ripatos' right to due process of law. The primary flaw perceived by the trial court is that the provisions do not set forth any requirement of notice of the attachment or an opportunity to be heard prior to the prejudgment seizure and attachment.

There is no need for us to analyze the constitutionality of the statute at this time, since we have already determined that the Ripatos waived by mutual contract any rights they may have had to bring an action against Farmers, and such action would naturally include a challenge to the statute which allowed the bank to take possession of the Ripatos' stores. Thus, we do not rule on this issue at this time.

Farmers also made other allegations of error which need not be addressed because they relate to instructions and the submission of issues to the jury, and we have already decided that the case should have been resolved by a directed verdict.

■ The Ripatos also sought and were granted discretionary review by this court. They assert that the trial court erred in granting Farmers' motion for a directed verdict on their cause of action for malicious prosecution. The trial court refused to allow the Ripatos to go forward on their claim for malicious prosecution on the grounds that the writs of possession had not been quashed at the time of trial. Farmers argues that the Ripatos failed to prove all of the six essential elements of a malicious prosecution cause of action. They are:

1. the institution or continuation of original judicial proceedings, either civil or criminal, or of administrative or disciplinary proceedings,

2. by, or at the instance, of the original plaintiff/complainant,

3. the termination of such proceedings in the original defendant's favor,

4. malice in the institution of such proceeding,

5. want or lack of probable cause for the proceeding, and

6. the suffering of damage as a result of the proceeding.

*Raine v. Drasin,* Ky., 621 S.W.2d 895 (1981).

There was no malice proven on the part of Farmers, nor had the writs of possession, upon which the malicious prosecution charge was founded, been resolved or quashed in the Ripatos favor. Therefore, we affirm the Lewis Circuit Court on this issue.

The Ripatos further argue that the trial court should have granted their motion for a partial summary judgment on the issue of whether Farmers was entitled to a defense of qualified immunity. Farmers has not chosen to contest this allegation. Nevertheless, as we have decided the action should never have come to the court in the first place, we need not decide whether a defense was or was not valid.

Lastly, the Ripatos contend that the trial court erred in refusing to grant them attorneys' fees. They maintain that enforcement of the allegedly unconstitutional KRS 425.076 was a violation of their due process rights and entitled them to an action under 42 U.S.C. § 1983, which in turn, pursuant to 42 U.S.C. § 1988, grants them collection of attorneys' fees.

As we have already held, the agreed order of November 1, 1982, set forth an effective bar in front of the Ripatos, forbidding them to go forward with any action. They promised not to sue for full and adequate consideration. They may not seek now to evade that promise and bring a collateral action against the state.

We therefore reverse the decision of the Lewis Circuit Court and hold that there was a valid agreed order in which the Ripatos made a covenant not to sue, which was breached by this action. The trial court should have granted Farmers' motion for a directed verdict.

As to the Ripatos' claims on cross appeal, we affirm the trial court on all issues.

We remand to the Lewis Circuit Court for proceedings consistent with this opinion.

LAMBERT, STEPHENSON, VANCE and WINTERSHEIMER, JJ., concur.

LEIBSON, J., concurs in a separate concurring opinion in which GANT, J., joins.

LEIBSON, Justice, concurring.

Respectfully, I concur with the holding in the Majority Opinion, the effect of which is to discharge the bank from liability to the Ripatos for consequential damages, but I disagree with the reasoning underlying this result.

The Majority Opinion is premised on the conclusion that "there was a valid agreed order in which the Ripatos made a covenant not to sue, which was breached by this action."

To the contrary, the factual underpinnings for the "agreed order" entered on November 1, 1982, were fully explored at a hearing before the trial court, following which the trial court "Set Aside" said "agreed order," finding:

"That at the time the agreed order was signed and entered by the Court the defendants [Ripatos] were no longer represented by the attorney who had negotiated the agreement on their behalf, he having resigned on October 26, 1982, and that the defendants were not in agreement with the provisions of the order at the time it was entered and did not consent to the entry of the order."

There was ample evidence to sustain the trial court in its findings, and in setting aside the agreed order. The evidence supported a finding that Betty Ripato did not participate in the discussion underlying the agreement, that neither Ripato agreed to its final terms, and that neither signed it. Further, the fact the Ripatos thereafter continued to operate the business did not constitute a waiver or ratification, because they thought it was their right to do so without regard to any agreement.

The trial judge decided he had signed the "agreed order" in error because the parties had not agreed to all of its terms. This finding should not be disturbed.

However, I agree with the result reached in the Majority Opinion. The fundamental question in this case which the Majority Opinion never reached, is whether ex parte prejudgment seizure statutory provisions utilized by Farmers Deposit Bank are adequate to withstand constitutional challenge. The trial court was in error in holding the process unconstitutional.

The proceedings and judgment on behalf of the Ripatos against the bank stem from the trial court's order dated October 8, 1985, holding unconstitutional "the provisions of KRS Chapter 425 as provides for prejudgment seizure and attachment of property without prior notice and hearing ... as violative of due process under the Fourteenth Amendment of the Constitution of the United States." I disagree.

The conditions for ex parte prejudgment attachment have been narrowly circumscribed in a series of United States Supreme Court decisions which can be referred to as *Fuentes* and its progeny. These include *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *North Georgia Finishing, Inc. v. Di Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); and *Carey v. Sugar*, 425 U.S. 73, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976). I will not attempt to summarize all of the law on the subject in this Concurring Opinion. Suffice it to say that not all ex parte, prejudgment seizures are unconstitutional; the provisional remedy still exists if the statutes providing it are adequate to comply with United States Supreme Court interpretation of the mandates of due process.

These requirements are discussed at length in an article by William R. Mapother, *The Constitutionality of Kentucky's Prejudgment Seizure Law*, 68 Ky.L.J. 557 (1979–80). Not coincidentally, Mr. Mapother also drafted much of Kentucky's present

prejudgment seizure statutory structure, seeking to comply with the mandatory language in the various United States Supreme Court decisions on the subject. Mr. Mapother's article summarizes the following "combination" of "factors ... necessary to 'save' a statute":

"(1) the decision to issue the writ is made by a judge;

(2) the plaintiff must post an indemnity bond prior to issuance of the writ;

(3) the plaintiff must be required to disclose the facts supporting his request for a writ with specificity;

(4) an early post-seizure hearing is required by the statute;

(5) the writ can be issued only upon narrowly defined grounds;

(6) the defendant can reclaim the property by posting a bond." *Id.* at 569–70.

The Kentucky prejudgment seizure statutes in KRS Chapter 425 meet these requirements, with perhaps one exception. The ex parte writ of possession can only be issued by a judicial officer when it "appears from facts shown by affidavit that great or irreparable injury would result to the plaintiff if issuance of the writ were delayed until the matter could be heard on notice." KRS 425.076(1). The only due process issue in our statutory structure is whether the alleged debtor is provided adequate notice and opportunity to be heard.

*Fuentes* and its progeny do *not* require that the alleged debtor be provided either a preseizure hearing nor an automatic hearing. They do require immediate notice to the debtor that the property has been seized and an *opportunity* to be heard *promptly* at the debtor's *option*. Under *Fuentes* and its progeny due process requires opportunity for a prompt post-seizure hearing at which the creditor must establish the grounds upon which the writ was issued. Kentucky's statutes expressly provide the alleged debtor with notice of the seizure and the right to demand a hearing to decide whether "the writ be quashed and any property levied on pursuant to the writ be released." KRS 425.081(1). Conduct of the hearing is specified in KRS 425.031. The statutory scheme provides that a provisional remedy is available only in extraordinary circumstances with provisions for notice and an opportunity to be heard. It is implicit that with a provisional extraordinary remedy such as this, the debtor will have a right to demand an immediate hearing; that such hearing must be provided as soon as time will permit, as indeed it was provided in the present case. With judicial interpretation extrapolating that the requirement for a "prompt" hearing is implied by the otherwise express provisions, an interpretation well within the obvious legislative intent, the statute complies with the United States Supreme Court requirements for due process as set forth in *Fuentes* and its progeny. As stated in a footnote to *Fuentes*, "we deal here only with the right to an *opportunity* to be heard.... [T]here is a likelihood that many defendants would forgo their opportunity, sensing the futility of the exercise in the particular case." 407 U.S. at n. 29, 92 S.Ct. at n. 29.

In the present case the facts are such that the challenge to due process is abstract and technical, lacking any substantive underpinnings. Therefore, we should uphold the constitutionality of the statutes and the adequacy of due process in this case.

GANT, J., joins in this concurring opinion.