**[J-1-2021] [MO: Todd, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| CAITLIN QUIGLEY, | : | No. 20 EAP 2020 |
| | : | |
| Appellee | : | Appeal from the Order of |
| | : | Commonwealth Court entered on |
| | : | 1/28/2020 at No. 1449 CD 2017 |
| v. | : | vacating/remanding the Order |
| | : | entered on 8/8/2017 by the |
| | : | Unemployment Compensation Board |
| UNEMPLOYMENT COMPENSATION | : | of Review at No. B-17-09-G-2764. |
| BOARD OF REVIEW, | : | |
| | : | ARGUED: March 9, 2021 |
| Appellant | : | |

**CONCURRING OPINION**

**JUSTICE WECHT**                                     **DECIDED: November 17, 2021**

I join the learned Majority opinion in full. I write separately to address in more detail the troubling procedural issues that occasioned this appeal. Specifically, the Unemployment Compensation Board of Review ("Board") *sua sponte* reviewed Caitlin Quigley's *eligibility* for unemployment compensation ("UC") benefits when only the *amount* of her UC benefits was at issue on appeal to the Board. By reaching for the threshold eligibility issue—even though that issue was uncontested and not ruled upon expressly by the referee in the proceedings below[1]—the Board deprived Quigley of notice and an opportunity to be heard on the question of her eligibility and dispensed completely with the adversarial process that is integral to our jurisprudence.

---

[1]     *See* Maj. Op. at 30.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."[2]  The Supreme Court of the United States has held that the Due Process Clause affords, among other things, procedural protections against "the mistaken or unjustified deprivation of life, liberty, or property."[3]  Although the guarantee of due process is ironclad, the form that such process takes is not.  The process due in one circumstance may well differ from that due in another.  Due process is flexible, inasmuch as its application to a given situation necessarily must correspond to the realities of the situation.[4]  Due process applies with equal force, and is just as adaptive, in the context of administrative proceedings, such as those before us here.[5]

Although due process can take many forms, its most basic pillar is the guarantee of notice and an opportunity to be heard—a tenet by now so ingrained and incontrovertible in our jurisprudence as to require no citation.  Nonetheless, the wisdom of the Supreme Court of the United States bears remembering:

> Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.

* * * *

---

[2]     U.S. CONST. amend. XIV, § 1.

[3]     *Carey v. Piphus*, 435 U.S. 247, 259 (1978).

[4]     *See generally Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *see also* Henry J. Friendly, *Some Kind of Hearing*, 123 U. PA. L. REV. 1267, 1279-95 (1975) (outlining eleven hallmarks of a fair hearing ranging from an unbiased tribunal to judicial review).

[5]     *See Kowenhoven v. Cty. of Allegheny*, 901 A.2d 1003, 1009-10 (Pa. 2006) ("Due process principles apply to quasi-judicial or administrative proceedings . . . .").

> This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.

> * * * *

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information . . . .[6]

Our legislature has recognized the fundamental nature of this principle, having long ago enshrined it in Pennsylvania's Administrative Agency Law.[7]

In this case, the Board considered Quigley's eligibility *sua sponte*. It did so in the absence of any notice that was reasonably calculated, under the circumstances, to apprise Quigley that the Board planned to review this issue on appeal. Consequently, the Board denied Quigley a meaningful choice between whether to appear or default, acquiesce or contest. In so doing, the Board denied her the due process of law:

> [D]ue process jurisprudence has never placed the onus upon the individual subject to the deprivation to anticipate such deprivation and launch a prophylactic challenge thereto. To the contrary, it is inherent in the concept of "notice" that the individual is to be provided with notice of adverse action; he is not expected to divine and preempt it.[8]

The Board's decision not to notify Quigley of its intent to review her eligibility for UC benefits thrust Quigley into the role of soothsayer. Perhaps Quigley could have known her eligibility was at risk had she gazed into a crystal ball, but even that would not suffice

---

[6] *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313-14 (1950) (citations omitted).

[7] *See* 2 Pa.C.S. § 504 ("No adjudication of a Commonwealth agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard.").

[8] *Commonwealth v. Hamlett*, 234 A.3d 486, 515 (Pa. 2020) (Wecht, J., dissenting).

as notice under *Mullane*, its progeny, or any reasonable understanding of the meaning of, and burdens associated with, the concept of notice.

Because Quigley had no notice of the Board's intent to review her eligibility, the Board, *ipso facto*, deprived Quigley of an opportunity to be heard on that issue. Fictional hearings have been known to observe better procedure than this.[9] In fact, by proceeding without Quigley's involvement, the Board deprived *itself* of any possible input Quigley could have offered regarding her eligibility. Most, if not all, legal proceedings contain some fact or law that a litigant or her counsel could clarify, thereby informing the decision-maker and helping to ensure the fairness and reliability of the adjudication.[10] After all, the entire point of a hearing is to give the litigants an opportunity to reflect upon the pending controversy and then advance arguments in support of or against a position in order to

---

[9] Literature supplies the following example:

"Herald, read the accusation!" said the King.

On this the White Rabbit blew three blasts on the trumpet, and then unrolled the parchment-scroll, and read as follows:—

> "The Queen of Hearts, she made some tarts
> All on a summer day:
> The Knave of Hearts, he stole those tarts
> And took them quite away!"

"Consider your verdict," the King said to the jury.

"Not yet, not yet!" the Rabbit hastily interrupted. "There's a great deal to come before that!"

LEWIS CARROLL, *Alice's Adventures in Wonderland*, *in* ALICE IN WONDERLAND 1, 85 (Donald J. Gray ed., W. W. Norton & Co. 3d ed. 2013) (1865).

[10] *See Snider v. Melindez*, 199 F.3d 108, 113 (2d Cir. 1999) ("[P]roviding the adversely affected party with notice and an opportunity to be heard . . . avoids the risk that the court may overlook valid answers to its perception of defects in the plaintiff's case.").

aid the decision-maker in its deliberations.[11]  Quigley received no such opportunity and, thus, lost through no fault of her own.[12]

Had the Board's *sua sponte* approach here been permitted to stand, it likely would have had a profound chilling effect upon claimants.  Believing that they are entitled to greater UC benefits, but not wanting to risk the benefits that they already have secured, how many claimants would choose not to appeal a referee's decision lest the Board address some dispositive, though uncontested, issue that renders them ineligible for compensation?  The least the Board could have done in this and similar cases involving *sua sponte* decisions without input from the losing party is grant reconsideration as a matter of course.  Yet the Board declined to do even this much.[13]  By failing to reconsider

---

[11]  *See Palko v. Connecticut*, 302 U.S. 319, 327 (1937) ("The hearing, moreover, must be a real one, not a sham or a pretense.").

[12]  The dissents authored by Judge Cohn Jubelirer and Judge Wojcik argue that, as a layperson who chose to represent herself, Quigley assumed the risk of an adverse outcome when she appealed the referee's decision to the Board.  *Quigley v. Unemployment Comp. Bd. of Review*, 225 A.3d 914, 928 (Pa. Cmwlth. 2020) (*en banc*) (Cohn Jubelirer, J., dissenting) (citing multiple cases); *id.* at 935-936 (Wojcik, J., dissenting) (same).  While it is true that *pro se* litigants are not entitled to any advantage because of their lack of legal training, *Triffin v. Janssen*, 626 A.2d 571, 573 (Pa. Super. 1993), all of the cases cited in the dissents readily are distinguishable because the *pro se* litigants in those cases received notice and an opportunity to be heard.  *See, e.g.*, *Groch v. Unemployment Comp. Bd. of Review*, 472 A.2d 286, 288 (Pa. Cmwlth. 1984) ("[A] review of the record reveals that Claimant was clearly advised . . . of her right to appeal to the Board.  She exercised this right . . . . Claimant was afforded the required *opportunity* to be heard throughout this proceeding.  Her failure to avail herself of that opportunity before the referee is no cause for any remedial action on her behalf . . . .") (emphasis in original).  Quigley, on the other hand, received neither notice nor a hearing when the Board *sua sponte* reviewed her eligibility for UC benefits.  Accordingly, this is an instance in which the fault does not lie with the litigant herself.

[13]  *See* Maj. Op. at 31 ("The Board then compounded the prejudice by denying [Quigley's] motion for reconsideration or remand, thereby depriving her of her only chance to present evidence and argument on this question."); *see also Quigley*, 225 A.3d at 922 n.11 (stating that the due process violation here was most egregious because, in part, the

the issue of Quigley's eligibility, the Board refused to acknowledge the possibility that other, as-yet-unexplored facts and authorities could alter its decision. Rarely can a decision-maker produce a reliably thorough adjudication without some input from the affected parties.[14] At the least, a sound adjudication in such circumstances is unpredictable and likely fortuitous.

This leads to my second point. *Sua sponte* decisions that forego notice and a hearing not only risk offending procedural due process, but they erode two vital aspects of the adversarial process: party control of litigation and the presence of a neutral decision-maker. The removal of these components diminishes the adversarial process and, by extension, public confidence in the law.[15]

---

Board "denied [Quigley's] request for reconsideration of its adjudication with no explanation").

[14] *See Gardner v. Florida*, 430 U.S. 349, 360 (1977) ("[D]ebate between adversaries is often essential to the truth-seeking function . . . ."); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 88 (1938) (Butler, J., dissenting) ("It may not justly be assumed that the labor and argument of counsel for the parties would not disclose the right conclusion and aid the Court in the statement of reasons to support it."). To be sure, there are some notable exceptions to the general bar on *sua sponte* decisions. *See, e.g.*, *In re Adoption of K.M.G.*, 240 A.3d 1218, 1228 (Pa. 2020) (observing that subject matter jurisdiction may be raised by a court *sua sponte*); *Commonwealth v. Hill*, 16 A.3d 484, 494 (Pa. 2011) ("Rule 1925 violations may be raised by the appellate court *sua sponte* . . . ."). These kinds of *sua sponte* decisions are crucial as they implicate the competency of a court to adjudicate the controversy presented or necessarily curtail the scope of review. However, the Board's decision here implicates neither jurisdiction nor issue preservation. Rather, the Board reviewed *sua sponte*, and without notice and a hearing, the uncontested, fact-intensive determination of Quigley's eligibility for UC benefits.

[15] *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring) (stating that the adversarial process is the best way to "generat[e] the feeling, so important to a popular government, that justice has been done"). The ancient Greeks, progenitors of our democracy, also understood the primacy of the adversarial process:

> ATHENA: Two sides are here, and only half is heard.

* * * *

Many jurists have identified this or that technique as the *sine qua non* of the adversarial process. For example, cross-examination, together with the Confrontation Clause, has famously been called "the greatest legal engine ever invented for the discovery of truth."[16] While such encomia are interesting in an academic sense, they could lead one to overlook the fact that the adversarial process is an amalgam that eludes easy distillation. It is a whole far greater than the sum of its many parts. In its simplest terms, the adversarial process is one in which legal disputes are resolved by having the parties present their conflicting views of fact and law before an impartial and relatively passive decision-maker.[17] While this generalization necessarily omits those outlier cases, such as Quigley's appeal to the Board, that do not conform perfectly to the textbook definition of the adversarial process, it nonetheless limns the general course taken by the majority of disputes in our legal system. Other models exist,[18] but the

---

My contestants,
summon your trusted witnesses and proofs,
your defenders under oath to help your cause.
And I will pick the finest men of Athens,
return and decide the issue fairly, truly—
bound to our oaths, our spirits bent on justice.

AESCHYLUS, *The Eumenides*, *in* THE ORESTEIA 227, 250, 253 (Robert Fagles trans., Penguin Books 1977) (458 B.C.E.).

[16] *California v. Green*, 399 U.S. 149, 158 (1970) (cleaned up).

[17] *See, e.g.*, *United States v. Sineneng-Smith*, ___ U.S. ___, 140 S. Ct. 1575, 1579 (2020) ("In both civil and criminal cases, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.") (cleaned up).

[18] *See, e.g.*, John H. Langbein, *Land Without Plea Bargaining: How the Germans Do It*, 78 MICH. L. REV. 204, 206-10 (1979) (describing the inquisitorial process in German criminal trials); *see also* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "inquisitorial system" to mean "[a] system of proof-taking used in civil law, whereby the judge conducts

adversarial process reigns in this country, where we rely upon it in the main to produce accurate verdicts, while also respecting individual autonomy.[19]

With this definition of the adversarial process in mind, one sees clearly the *dramatis personae*, their respective roles, and the method to be used. Two rival sides, a neutral arbiter, the sharp clash of proofs, and the resulting impartial (not infallible) judgment. Upset this dialectic, and the machinery of our jurisprudence can falter. This is precisely what happened when the Board *sua sponte* reviewed Quigley's eligibility for UC benefits.

Within our adversarial system, "zealous advocacy is not only tolerated, it is expected,"[20] yet the Board reviewed Quigley's eligibility unaided by any advocacy—either for or against. This should have signaled to the Board the need for restraint.[21] Notwithstanding the dearth of advocacy, the Board pressed on, addressing the eligibility issue under the aegis of its "super[-]adjudicatory responsibilities" as the defender of the

---

the trial, determines what questions to ask, and defines the scope and the extent of the inquiry").

[19] *See Pearson v. Ohio*, 488 U.S. 75, 84 (1988) (stating that the adversarial process "is premised on the well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the question") (cleaned up); *see also Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.").

[20] *Am. Civil Liberties Union of Pa. v. Pa. State Police*, 232 A.3d 654, 670 (Pa. 2020).

[21] *See United States v. Fruehauf*, 365 U.S. 146, 157 (1961) (declining to rule upon issues "which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaceted situation embracing conflicting and demanding interests").

UC Compensation Fund.[22] By pursuing such an agenda, rather than limiting itself to those issues squarely before it on appeal, the Board engaged in conduct that is incompatible with a neutral decision-maker's duty "to hold the balance nice, clear, and true."[23] Accordingly, Quigley's appeal to the Board was the antithesis of a party-controlled proceeding before a neutral decision-maker.[24] The Board assumed the mantle of omniscient inquisitor, reducing Quigley to a bystander in her own appeal.[25]

If "[t]he validity and moral authority of a conclusion largely depend on the mode by which it was reached,"[26] then the Board's decision here is bankrupt on both counts.[27] A scrupulously neutral decision-maker accedes to party control of the proceeding, and, in turn, that control lends the enterprise its legitimacy. Moreover, it is that legitimacy which endows judicial and quasi-judicial bodies with their authority, as they have few tools to secure compliance with their decisions. As Alexander Hamilton observed:

> The executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary on the contrary has no influence over either the sword or the purse, no direction either of the strength or of the wealth of the society, and

---

[22]   *See* Board's Br. at 27 (cleaned up).

[23]   *See Tumey v. Ohio*, 273 U.S. 510, 532 (1927).

[24]   *See McNeil v. Wisconsin*, 501 U.S. 171, 183 n.2 (1991) ("What makes a system adversarial . . . is . . . the presence of a judge who does not . . . conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties.").

[25]   *See Fuentes v. Shevin*, 407 U.S. 67, 81 (1972) ("[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights.") (cleaned up).

[26]   *McGrath*, 341 U.S. at 171 (Frankfurter, J., concurring).

[27]   *See Mapp v. Ohio*, 367 U.S. 643, 677 (1961) (Harlan, J., dissenting) (stating that ruling on an issue not raised by the parties is unlikely "to promote respect either for the Court's adjudicatory process or for the stability of its decisions").

can take no active resolution whatever.  It may truly be said to have neither FORCE nor WILL, but merely judgment . . . .[28]

Thus, the integrity of that judgment is paramount.  It is best secured by strict adherence to the adversarial process.

---

[28]    ALEXANDER HAMILTON, *The Federalist No. 78*, *in* WRITINGS 420, 421 (Joanne B. Freeman ed., The Library of America 2001) (1788).